UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

       -v.-

FABIO PORFIRIO LOBO,
    a/k/a "Fabio Porfirio Lobo Lobo,"
    a/k/a "Fabio Lobo,"

                   Defendant.

15 Cr. 174 (LGS)

## THE GOVERNMENT'S PRE-HEARING MEMORANDUM REGARDING *FATICO* PROCEEDINGS RELATING TO DEFENDANT FABIO PORFIRIO LOBO

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for the United States*
*of America*

Emil J. Bove III
Matthew J. Laroche
    Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................ 1

    I. The Defendant and President Lobo Sosa Agree to Protect the *Cachiros* in
Exchange for Bribes........................................................................................... 3

    II. The Defendant Helps the *Cachiros* Distribute Hundreds of Kilograms of Cocaine............. 5

    III. The Defendant Facilitates Maritime Cocaine Trafficking by Honduran Officials and the
Sinaloa Cartel at Puerto Cortes ........................................................................ 7

    IV. The Defendant Assists CW-2 in Secreting Narcotics-Derived Assets
from Honduran Authorities ................................................................................ 8

    V. The Defendant Agrees to Facilitate Security for a Multi-Ton Load of Cocaine
Purportedly Destined for the Leader of the Sinaloa Cartel ........................................ 9

        A. The Defendant's March 2014 Meeting with CS-1 ......................................... 11

        B. The Defendant's May 2014 Meetings with CS-2 and CS-3............................. 12

    VI. The Defendant Meets with Honduran Military and Police Officials to
Coordinate Security for the Multi-Ton Cocaine Load ............................................. 15

        A. The Defendant Meets with Colonel Amaya ................................................. 15

        B. The Defendant Meets with Members of the Honduran National Police ........................ 16

        C. The Defendant Introduces CS-2 to General Pacheco ..................................... 18

        D. The Defendant Meets with Colonel Amaya ................................................. 19

    VII. The Defendant Is Arrested After Traveling to Haiti to Collect Millions of Dollars
in Drug Proceeds.............................................................................................. 21

LEGAL STANDARD................................................................................................. 22

DISCUSSION ............................................................................................................ 23

CONCLUSION........................................................................................................... 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

FABIO PORFIRIO LOBO,
    a/k/a "Fabio Porfirio Lobo Lobo,"
    a/k/a "Fabio Lobo,"

                      Defendant.

15 Cr. 174 (LGS)

        The Government respectfully submits this memorandum relating to the March 6, 2017 *Fatico* hearing being conducted in connection with the sentencing of Fabio Porfirio Lobo (the "defendant" or "Lobo").[1]  As explained below, the Government expects to establish through witness testimony and other evidence that the applicable range under the United States Sentencing Guidelines is life imprisonment, and that the balancing of the Section 3553(a) factors establishes the need for a substantial sentence.

## **BACKGROUND**

        The defendant is the son of Porfirio "Pepe" Lobo Sosa ("Lobo Sosa"), who was the President of Honduras between approximately 2010 and approximately 2013.  Beginning in at least approximately 2009, while Lobo Sosa was pursuing the Honduran presidency, the defendant joined a drug-trafficking conspiracy with his father and others by accepting bribes in exchange for protecting and assisting traffickers in Honduras.

---

[1] The Government respectfully requests, with the consent of defense counsel, that the Court accept this submission for *in camera* review in connection with the upcoming hearing and file it under seal temporarily.  If these requests are granted, the Government will file this brief publicly following the hearing.

One of the drug-trafficking organizations that the defendant assisted and supported was known as the "*Cachiros*," which was a prolific and violent criminal syndicate that relied on connections to politicians, military personnel, and law enforcement to transport cocaine to, within, and from Honduras.  While the defendant's father acted as the President of Honduras, the defendant helped the leaders of the *Cachiros* maintain control in his country—and avoid justice—as they received huge quantities of cocaine sent from South America and helped send the drugs to the United States.  On at least two occasions, the defendant personally helped escort multi-hundred-kilogram cocaine loads that were received and transported by the *Cachiros*.  Also in exchange for a bribe, the defendant facilitated drug-trafficking at one of the largest commercial ports in Honduras by a Honduran congressman and the Mexican Sinaloa Cartel.  In short, the defendant acted with impunity and helped the *Cachiros* and others to do the same, enriching himself while Honduras was ravaged by drug trafficking and developed into one of the most violent places in the world.

The Drug Enforcement Administration ("DEA") captured some of the defendant's most recent drug-trafficking activities on tape after the leaders of the *Cachiros* ("CW-2" and "CW-3") started to covertly provide information and assistance to the United States government in late 2013.[2]  Due to public financial sanctions and asset seizures targeting the *Cachiros* in September 2013, the defendant believed that law enforcement scrutiny of CW-2 and CW-3 had finally required them to limit their direct participation in drug trafficking.  The defendant therefore

---

[2] For ease of reference, the Government has used in this submission the same pseudonyms for individuals who assisted the investigation—"CW-2," "CS-1," "CS-2," and "CS-3"—that are used in the September 6, 2016 Presentence Investigation Report ("PSR").

stepped in to help coordinate on behalf of the *Cachiros* the receipt, protection, and transportation of a multi-ton load of cocaine for purported representatives of now-detained Mexican kingpin Joaquin Archivaldo Guzman Loera, a/k/a "El Chapo" ("Chapo").  Expecting to make millions of dollars, the defendant met with confidential sources acting at the direction of the DEA, agreed to provide military and "logistics" support to these purported drug traffickers, and facilitated introductions to at least two Honduran military officials.  The defendant's relationship of trust with the *Cachiros* leadership was so strong that even after CW-2 was detained in the United States, the defendant communicated with him in prison and agreed to travel to Haiti to pick up drug proceeds. The defendant was instead arrested in Port-au-Prince and brought to the United States, where he now stands convicted and pending sentence before the Court.

## I.   The Defendant and President Lobo Sosa Agree to Protect the *Cachiros* in Exchange for Bribes

While Lobo Sosa was running for President of Honduras in 2009, the leaders of the *Cachiros* paid him over approximately $500,000 in exchange for, *inter alia*, political protection from law enforcement investigations, prevention of extradition to the United States,[3] and awards of contracts by Honduran government agencies to money-laundering front companies controlled by the *Cachiros*.  (*See* GX 22 (list of *Cachiros* front companies)).  The defendant was introduced to CW-2 by Jorge Lobo, another relative, around the time that Lobo Sosa was elected President. Jorge Lobo and others had explained to CW-2 that the defendant could facilitate the award of

---

[3] Honduras did not authorize the extradition of Honduran drug traffickers to the United States until approximately 2012.  (PSR ¶ 11).  No such extraditions occurred while President Lobo Sosa was in office.  *See infra* note 6.

government contracts.  CW-2 met with the defendant and agreed to create one or more front companies to receive the contracts, and to pay kickbacks of between 10% and 20% of the contracts' value.  CW-2 subsequently established, and used drug proceeds to capitalize, a construction company named *Inmobiliaria Rivera Maradiaga SA de CV* ("*INRIMAR*"), which was awarded contracts by Honduran government agencies such as *Despachos de Obras públicas Transporte y Vivienda* ("*SOPTRAVI*"), *i.e.*, the Honduran Ministry of Public Works, Transportation, and Housing.

After Lobo Sosa was elected President of Honduras, Juan Gómez Meléndez—a former governor and former *diputado* (congressman)—set up a meeting between the defendant, Lobo Sosa, *diputado* Oscar Ramón Nájera, and CW-2.  During the meeting, President Lobo Sosa assured CW-2 that CW-2 and CW-3 would not have problems with the Honduran government or be extradited to the United States, and President Lobo Sosa indicated that the defendant would help coordinate these protections.  President Lobo Sosa placed a call during the meeting to a man CW-2 understood to be General Julián Pacheco Tinoco ("General Pacheco") and told the defendant after the call to speak to "him," *i.e.*, General Pacheco, if CW-2 had any "problems."  President Lobo Sosa also reiterated his support for the *Cachiros* front companies, and he and the defendant later supported and assisted CW-2 and CW-3 in commercial endeavors used by the *Cachiros* in part to increase the appearance of their legitimacy and in part to launder drug proceeds.

## II.   The Defendant Helps the *Cachiros* Distribute Hundreds of Kilograms of Cocaine

In approximately 2010, the defendant expressed interest in making money by taking a more active role in CW-2's drug-trafficking activities.  The defendant agreed to seek permission from Honduran military personnel to receive cocaine-laden aircraft at a runway, but later informed CW-2 that the plan would not work because there was too much law-enforcement scrutiny in the area.

In approximately 2012, the defendant participated directly in the transportation of approximately 400 kilograms of cocaine sent via aircraft to a clandestine airstrip in northeast Honduras, near Chachaguala in the Cortes Department.[4]  While the cocaine was transported south in a truck toward San Pedro Sula, the defendant rode with CW-2 in a separate vehicle so that the defendant would be able to place calls to Honduran officials in the event of any law enforcement interference.  The drugs arrived in San Pedro Sula without incident, and the defendant did not make any such calls.  CW-2 nevertheless compensated the defendant for his participation by giving him an armored vehicle, an AR-15 machine gun, and approximately $20,000.

Around the same time that the defendant assisted in the transportation of the cocaine, he asked CW-2 to introduce him to other drug traffickers.  CW-2, in turn, introduced the defendant to Honduran drug trafficker Carlos Arnoldo Lobo, a/k/a "Negro Lobo" ("Carlos Lobo"), who is not related to the defendant.  The Honduran government had started to seize Carlos Lobo's assets in approximately 2011, and CW-2 brought him to a meeting with the defendant to discuss

---

[4] Honduras is divided into 18 departments, akin to the 50 states.

his problems with law enforcement.[5]  CW-2 did not participate in the meeting, but Carlos Lobo told him afterwards that he paid the defendant approximately $100,000 in an effort to obtain political support and avoid additional problems with law enforcement.[6]

In approximately 2013, the defendant assisted CW-2 in the transportation of approximately one ton of cocaine, which was received at a clandestine airstrip in the Colon Department in eastern Honduras, in the vicinity of Farallones.  The defendant brought at least two members of the Honduran military, who were armed with an AR-15 machine gun as well as pistols. The defendant, the military personnel, and CW-2 drove in a separate vehicle ahead of the cocaine to ensure that it was not interdicted while being transported west to the Copan Department near the Honduras-Guatemala border, where the drugs were transferred to Digna Valle-Valle and other members of another major Honduran drug-trafficking organization known as "*Los Valles*."[7]  The

---

[5] *See* Marguerite Cawley, *Honduras Arrests Drug Trafficker 1st in Line for Extradition* (Mar. 28, 2014),  http://www.insightcrime.org/news-briefs/honduras-arrests-drug-trafficker-1st-in-line-for-extradition (last accessed Feb. 28, 2017).

[6] After President Lobo Sosa left office, Carlos Lobo became the first Honduran national extradited to the United States based on a drug-trafficking charge.  *See International Narcotics Trafficker Extradited from Honduras to United States Sentenced* (Dec. 9, 2014), https://www.justice.gov/usao-sdfl/pr/international-narcotics-trafficker-extradited-honduras-united-states-sentenced (last accessed Feb. 28, 2017).  Carlos Lobo subsequently pleaded guilty in the Southern District of Florida to a violation of Title 21, United States Code, Section 963, and was sentenced to a 240-month term of imprisonment.  *See United States* v. *Lobo*, No. 11 Cr. 20358 (S.D. Fla.).

[7] In February 2015, Digna Valle-Valle pleaded guilty in the Southern District of Florida to a violation of Title 21, United States Code, Section 963, and she was subsequently sentenced to a 135-month term of imprisonment.  *See United States* v. *Valle-Valle*, No. 13 Cr. 20897 (S.D. Fla.).

defendant was paid approximately $50,000 in cash for his participation in this successful transportation operation.

## III.  The Defendant Facilitates Maritime Cocaine Trafficking by Honduran Officials and the Sinaloa Cartel at Puerto Cortes

In approximately 2012 or 2013, the defendant assisted a maritime drug-trafficking venture involving *diputado* Fredy Renán Nájera Montoya, as well as a high-ranking member of Mexico's Sinaloa Cartel, a Honduran drug trafficker, and others.[8]  The defendant first met in San Pedro Sula with Nájera Montoya and two other individuals whom the defendant understood to be drug traffickers.  During the meeting, Nájera Montoya explained the proposed venture to the defendant and Miguel Pastor, who was at the time a leading minster at *SOPTRAVI*, which played a role in Honduran customs operations at Puerto Cortes, a major commercial port on the western Atlantic coast of Honduras.

The defendant subsequently participated in another meeting in San Pedro Sula, which was attended by Nájera Montoya, Pastor, another Honduran customs official, and at least one additional Mexican drug trafficker.  The group further discussed the proposed venture, including the receipt of cocaine at Puerto Cortes and importation of at least some of the drugs into the United States via Mexico.  At the end of the discussion, the Mexican drug traffickers gave

---

[8] Based on communications with defense counsel, the Government understands that the information set forth in Section III—which is derived from paragraphs 13 through 15 of the PSR— is undisputed for purposes of the defendant's sentencing.  Insofar as this information remains undisputed at sentencing, the Government consents to striking from the PSR any information in paragraphs 13 through 15 not set forth herein.  The Government further understands baesd on conversations with defense counsel that paragraphs 8, 9, 11, and 23 through 29 of the PSR are not disputed for purposes of sentencing, except for the statement in paragraph 29 that the defendant "is responsible for over 450 kilograms of cocaine," which the defendant disputes.

Nájera Montoya a large quantity of U.S. $100 bills, which Nájera Montoya provided to Lobo and Pastor.  Lobo made at least approximately $50,000 for participating in these meetings.

## IV.  The Defendant Assists CW-2 in Secreting Narcotics-Derived Assets from Honduran Authorities

In May 2013, the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC") imposed financial sanctions on CW-2 and CW-3 by designating the *Cachiros* pursuant to the Foreign Narcotics Kingpin Act.[9]  In September 2013, OFAC imposed further sanctions by designating seven individuals, including CW-2 and CW-3, as well as five front companies associated with CW-2 and CW-3, including *INRIMAR* and the Joya Grande Zoo in Honduras.  (*See* GX 22).[10]  Around the same time, CW-2 learned that the Honduran *Oficina Administradora de Bienes Incautados* ("*OABI*") was planning to seize the zoo as well as additional assets and funds linked to CW-2, CW-3, and the *Cachiros*.  CW-2 arranged a meeting at a hotel with the defendant and *diputado* Oscar Ramón Nájera (who was also present at the 2010 meeting with President Lobo Sosa).

During the meeting, the defendant called Humberto Palacios Moya, an *OABI* official, and confirmed that *OABI* planned to seize the zoo and other assets.  The defendant left the hotel after the call, and subsequently returned with a list of assets that *OABI* planned to seize.  CW-

---

[9]  OFAC, *Specially Designated Nationals Update* (May 31, 2013), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20130531.aspx (last accessed Feb. 28, 2017).

[10]  OFAC, *Treasury Targets "Cachiros" Drug Trafficking Organization in Honduras* (Sept. 19, 2013), https://www.treasury.gov/press-center/press-releases/Pages/jl2168.aspx (last accessed Feb. 28, 2017).

2 paid over approximately $50,000 for this information, and used it to move and hide assets in a partially successful effort to avoid seizures by *OABI*.

## V. The Defendant Agrees to Facilitate Security for a Multi-Ton Load of Cocaine Purportedly Destined for the Leader of the Sinaloa Cartel

Following the *OABI* seizures, CW-2 and CW-3 began to provide information and assistance to the DEA.  In mid-December 2013, at the direction of the DEA, CW-2 met with the defendant and asked for security and logistical support in connection with the transportation of approximately 2,500 kilograms of cocaine ("animals") to be sent from Colombia to the Atlantic coast in eastern Honduras via a maritime route.  (GX 1 at 4:13-21).  CW-2 recorded the meeting:



During the conversation, CW-2 indicated that he planned to keep "working" with cocaine shipments because *OABI* "took all of my properties," and the defendant responded that "there's no other option."  (GX 1 at 4:9).  CW-2 explained to the defendant that the drugs would be sent by a Colombian to the vicinity of Limon, in the Colon Department, then transported southeast to Tocoa, where CW-2 and the defendant would assume responsibility for the transportation of the drugs further west.  (GX 1 at 5:13, 8:1-13).  CW-2 proposed that he and the defendant "ride ahead" of

9

the cocaine-transport vehicle, "[j]ust like the previous times," in case they needed to address any attempted interdictions of the drugs ("take down a couple of operations").  (GX 1 at 5:13).  CW-2 also told the defendant that the cocaine was destined for "El Chapo," and that "[s]ome of Chapo's people" were in Honduras to assess the *Cachiros* drug-trafficking operations.  (GX 1 at 5:17-21, 8:9).

        The defendant agreed to use a security team of "[a]bout 4" men in two vehicles, including "Moncho's driver" and "[a]nother guy that's around from the . . . cops."  (GX 1 at 9:3-10:5).  CW-2 offered to compensate the defendant for his efforts with a financial stake in approximately 200 kilograms of the cocaine, less transportation costs, based on the current per-kilogram price in Honduras.  (GX 1 at 5:1-6:1).  They discussed a price of approximately $13,000, less approximately $5,000 for "costs" and "transportation," yielding a "clean $8,000" per kilogram and, thus, a profit to the defendant of approximately $1.6 million.  (GX 1 at 6:1, 7:9-17, 8:5).  The defendant sought to ensure that CW-2 would "collect it in cash."  (GX 1 at 7:15).

### A.  The Defendant's March 2014 Meeting with CS-1

In March 2014, CW-2 introduced the defendant to a confidential source acting at the direction of the DEA ("CS-1").  CS-1 recorded the meeting:[11]



CW-2 introduced CS-1 as a "friend of Chapo" who came to Honduras to discuss the "pending" drug transaction.  (GX 2 at 4:25-5:7)  CS-1 told the defendant that he was "sent to take a look" so that the drug load would "turn out right and for everyone to be happy."  (GX 2 at 5:21-25)  The defendant agreed with CS-1 that "[p]roblems can arise at any time" and "people need to have responsibilities for . . . what they accept and that's all."  (GX 2 at 6:9-13)  The defendant also confirmed that he expected to be compensated with the equivalent of "200" kilograms of cocaine.  (GX 2 at 6:27).

---

[11] In the beginning of the meeting, the defendant, CW-2, and CS-1 discussed news reports regarding recent arrests in Honduras of members of the "*Los Espinoza*" organization who were recruiting children in the vicinity of Comayagua province.  *See* Michael Lohmuller, *Honduras Criminal Group Using Narcocorridos to Attract Child Recruits* (Mar. 10, 2014), http://www.insightcrime.org/news-briefs/honduras-criminal-group-using-narcocorridos-to-attract-child-recruits (last accessed Feb. 28, 2017).

**B.   The Defendant's May 2014 Meetings with CS-2 and CS-3**

In May 2014, CW-2 introduced the defendant to two additional DEA confidential sources ("CS-2" and "CS-3," collectively the "Sources").  The Sources recorded the meeting:



CW-2 explained to the defendant that CS-2 was the "owner of the merchandise," *i.e.*, the pending multi-ton cocaine load.  (GX 3 at 2:15).  CS-2 told the defendant that they now planned to ship 3,000 kilograms of cocaine, and the defendant indicated that he expected to be compensated with 10% of the load, now 300 kilograms rather than 200.  (GX 3 at 4:1, 5:9-13, 7:13).

The defendant confirmed during the meeting that he had assisted CW-2 while the defendant's "dad" was "president" of Honduras:

| CS-2 | Have you done it with him [*i.e.*, CW-2]? |
|---|---|
| Defendant | We have done it. |
| CS-2 | [U/I] sense.  And the work that I was receiving before, was it . . . |
| CW-2 | Everything, everything.  Almost 60 percent. |
| | // |
| Defendant | Uh, huh. |
| | // |
| CW-2 | Ok.  Since your dad was president? |

|            | //          |
|------------|-------------|
| Defendant  | Yeah. [U/I]. |

(GX 3 at 9:1-13). After CW-2 described having "helped" Lobo Sosa "with a bit of money" during

his "campaign," the defendant responded that he had developed a relationship of "[t]rust at a 100

percent" with CW-2 and that "[w]orking with trust is the best." (GX 3 at 13:7-14:5).

CS-2 asked the defendant to describe the "kind of support" he would provide and

inquired if the assistance would include "help from the military"; the defendant responded that his

support would include "[e]verything." (GX 3 at 5:15-25). Referring to the one-ton load of cocaine

that the defendant helped transport in exchange for $50,000, CW-2 explained: "[T]he last time we

. . . [t]hey loaded me up with them and we would go in the guard . . . ." (GX 3 at 6:1). CS-2 then

engaged in the following exchange with the defendant:

| CS-2       | . . . I just want you to explain to me what your support would consist of, with what people. With the whole military group, would that be the full support? |
|------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Defendant  | Yes.                                                                                                                                                         |
| CS-2       | Everything that is part of that is by land?                                                                                                                  |
| Defendant  | Everything [U/I].                                                                                                                                            |

(GX 3 at 6:11-17). The defendant later clarified that he would be supported by "current" Honduran

military officials who "remain[ed] as friends" after Lobo Sosa finished his term as president:

| CS-2       | And if you have all the military support, then there's nothing more secure than that. |
|------------|----------------------------------------------------------------------------------------|
| Defendant  | Well, yes.                                                                             |
| CS-2       | You know what I mean?                                                                   |
| Defendant  | Yes.                                                                                   |
| CS-2       | . . . Do you have it on the outside or is it from, from the, from the former Generals or, or fro, from, from friends? Or are they Federals or who is it with? |
| Defendant  | Current.                                                                                |
| CS-2       | With the current ones.                                                                 |
| Defendant  | Yes.                                                                                   |

13

| CS-2 | Okay. |
|------|-------|
| Defendant | [U/I] once the, the man comes out, of his office, as they say . . . They remain as friends. |

(GX 3 at 15:4-22).  CS-2 asked to "get together . . . with the Generals" at some point.  (GX 3 at 16:17).  The defendant explained that, in addition to military connections, he would also provide "logistics" support—*i.e.*, participate in the transportation of the drug load—and answered "Yes" when asked if his associates would "bring it by land all the way."  (GX 3 at 8:5-27).  CS-2 asked "how many people do you have," and the defendant responded "[w]hatever we need."  (GX 3 at 21:1-3).

The following day, the defendant met again with the Sources, who recorded the meeting:



CS-2 indicated that CW-2 would help receive the drug load in "international waters," that the defendant and others would be responsible for transporting the cocaine from eastern Honduras ("there") to San Pedro Sula ("here"), and that CS-2 would distribute the cocaine ("work") in "California, Chicago, in Miami, along the whole East Coast" and in "New York."  (GX 4 at 5:25-27, 14:9).  CS-2 reiterated his request that the defendant introduce him to a "general."  (GX 4 at

3:1-5, 6:1, 7:5).  The defendant and CS-2 also agreed that they would "avoid as much as possible any communication over the telephones" in an effort to prevent interceptions that would implicate the defendant or his "military people" in the crime.  (GX 4 at 2:12-16).

## VI.  The Defendant Meets with Honduran Military and Police Officials to Coordinate Security for the Multi-Ton Cocaine Load

### A.  The Defendant Meets with Colonel Amaya

In early June 2014, CS-2 and CS-3 (but not the defendant) discussed the purported drug load with members of the *Pólicia Nacional de Honduras* ("Honduran National Police")—including some of the defendants named in Superseding Indictment S1 15 Cr. 174 (LGS)—during a meeting in Honduras.  Around the same time, the defendant and the Sources met with, among others, Colonel Mario Amaya, a/k/a "El Tigre," a member of the *Fuerzas Armadas de Honduras*, *i.e.*, the Honduran Armed Forces.  CW-2 was present for part of the meeting, and Colonel Amaya agreed to introduce the defendant and the Sources to others who could facilitate receipt of the anticipated maritime drug shipment.

**B.  The Defendant Meets with Members of the Honduran National Police**

In approximately late June 2014, the defendant and the Sources met with members of the Honduran National Police—including his co-defendants in this case—during a recorded meeting:



16

During the meeting, the Sources explained that the cocaine shipment was "heading to New York," and that they faced time pressure to "cross to the United States." (GX 5 at 30:1-19). CS-2 explained that he wanted a "controlled route . . . to the fullest," and that he expected to have "separate" support from the Honduran "intelligence side"—referring to the defendant's efforts, including the anticipated introduction to the "Intelligence General," *i.e.*, General Pacheco. (GX 5 at 7:2-6, 8:7-11; *see also* GX 5 at 29:19 (CS-2 explaining that "it's all on what the intelligence man tells me. The general from here will support us by receiving [U/I]")).

The National Police co-defendants placed a map of Honduras on the table at the meeting and described to the defendant and the Sources the Honduran law enforcement presence along potential routes for the cocaine between Limon, Colon in the west of Honduras and La Entrada, Copan, near the Honduras-Guatemala border. (*E.g.*, GX 5 at 5:21, 9:1-33).[12] The co-defendants also described their ranks and discussed establishing a "center of operations" in San Pedro Sula. (GX 5 at 28:19-23. 40:8-16). In exchange for their assistance, the Police requested new phones for communications, vehicles to use, a pool of $200,000 for "logistics," *i.e.*, bribes to other officials, and bribes of $100,000 per person for themselves ("Independently of the 200,000 dollars and the cars"). (GX 5 at 16:19, 18:19-19:3, 28:1-17, 36:21-35, 45:10-12).

---

[12] For example, one of the National Police assured the defendant and the Sources that, in the vicinity of El Progreso (east of San Pedro Sula), there were two members of the "Preventive" police—*i.e.*, the *Policía Nacional Preventiva*—"on a bike, 2 in patrol, the max 3. But from 12:00 midnight, to 6:00 in the morning there's no one." (GX 5 at 22:27-23:4).

## C.   The Defendant Introduces CS-2 to General Pacheco

Around the time of the meeting between the defendant, the National Police co-defendants, and the Sources, the defendant introduced CS-2 to General Pacheco in another recorded meeting.  A driver picked the defendant and CS-2 up, and the defendant directed him to take them "to Tinoco's."  (GX 6 at 7:17).  After they arrived, one of General Pacheco's aids greeted the defendant ("Mr. Fabio"), and the defendant explained to CS-2 that "[s]he already knows me." (GX 6 at 17:11-27).  The defendant and CS-2 then waited for General Pacheco inside his office:



When General Pacheco entered the office, the defendant introduced CS-2 as a "friend."  (GX 6 at 19:19).  CS-2 then explained to General Pacheco that he and the defendant wanted to know if General Pacheco "would be able to cooperate," by providing "authorization" and "consent," for CS-2 and the defendant to "come here with merchandise, with drugs."  (GX 6 at 19:25-20:1).  The defendant assured General Pacheco that "it's not much" cocaine, but General Pacheco walked out of the room abruptly:

| Pacheco | With drugs? |
|---|---|
| CS-2 | Yes, sir.  I don't know if it would be possible and we ca-… |
| Pacheco | [U/I]  No, [U/I] Fabio. |
| Defendant | No, it's not much. [U/I] |
| Pacheco | No.  Excuse me, excuse me. |

(GX 6 at 20:3-11).

### D.  The Defendant Meets with Colonel Amaya

The defendant also met with Colonel Amaya, an associate of the *Cachiros* named Jose Antonio Funez Lisser ("Funez") who was unaware that CW-2 and CW-3 were assisting law enforcement, and the Sources, who recorded the meeting:



Lobo       Col. Amaya       Funez

CS-2 confirmed that the three-ton shipment—"[t]hree big ones"—would be arriving "[b]y water," he had "the police taken care of," and that he also wanted to obtain assistance from the Honduran military ("the green ones"). (GX 7 at 10:29-33, 12:11-35; *see also id.* at 24:23 (CS-2 asking about "Marines")). Funez indicated that he could help receive the load, that "[e]verything is safe," and that he only worked with "trustworthy people." (GX 7 at 10:11, 10:23, 11:11; *see also id.* at 15:4 ("We'll pick up . . . the whole route is clean.")). But Funez also suggested that "one doesn't need" the Honduran military. (GX 7 at 10:35). Funez later reiterated to the defendant and the Sources his concerns about involving Honduran officials in the cocaine shipment because he considered the levels of "corruption" to be tantamount to "treason":

| Funez | . . . Certain things happen here and the friend here knows it, and [U/I] . . . The political system here has collapsed; here in this country . . . |
|-------|---------------------------------------------------------------------------------------------------------------------------------------------------|
| CS-2  | Uh-hum                                                                                                                                            |
| Funez | . . . due to corruption.                                                                                                                         |
| CS-2  | Got it.                                                                                                                                           |
| Funez | And when I talk about corruption; I'm talking about treason.                                                                                     |
| CS-2  | That's why they die.                                                                                                                             |
| Funez | I'm talking about treason and it's not convenient here to get government people involved in one of these things, because they'll betray you.      |

(GX 7 at 20:11-21:1). CS-2 indicated that Funez was "hired" for the "logistics" associated with receiving the maritime cocaine shipment, but "not . . . in the area of security" because he did not have the type of military connections that the defendant had touted. (GX 7 at 19:9, 20:1).

**VII.   The Defendant Is Arrested After Traveling to Haiti to Collect Millions of Dollars in Drug Proceeds**

Between July and September 2014, the defendant repeatedly expressed interest in receiving payment from CS-2 for the cocaine shipment.  (*E.g.*, GX 8 at 7:23 ("We need $"); *id.* at 9:11 ("When is the paper coming?"); *id.* at 21:13-15 ("Yes man, and your friend [CS-2] . . . [w]hat happened to him[?]")).  The defendant continued to communicate with CW-2 into December 2014.  (GX 8 at 27-30).  In approximately early 2015, CW-2 surrendered voluntarily in the United States.  (PSR ¶ 24).  Well aware that CW-2 was incarcerated, the defendant provided a third party a telephone number at which CW-2 could reach the defendant from prison.  (*Id.*).  On March 17, 2015, CW-2 called the defendant and told him that he would call again in a few days from a location that was more secure ("In a more calm setting").  (*Id.*).

On April 5, 2015, the defendant used an email account subscribed in a false name to write to CW-2 in prison.  (PSR ¶ 25).  Two days later, on April 7, CW-2 conducted a consensually recorded call to the defendant.  (PSR ¶ 26).  CW-2 told the defendant that he was calling from a "safe number" and that the multi-ton drug transaction involving the Sources had been successfully completed.  (*Id.*; *see also* GX 9 at 2:6, 4:9).  The defendant described the news as a "blessing," and confirmed that he was to receive a stake in 300 kilograms from the load worth a total of approximately $2.7 million.  (PSR ¶ 25; *see also* GX 9 at 4:19, 7:1-27).  The defendant then agreed to meet with the Sources to pick up the shares of the proceeds of the shipment that were owed to the defendant and CW-2.  (PSR ¶ 26).

On May 11, 2015, CW-2 conducted another consensually recorded call to the defendant.  (PSR ¶ 27).  During the call, the defendant indicated that he was "always standing at

the foot of the flag, just waiting here . . . like a falcon," and "excited . . . [l]ike a country bride" to pick up the drug money. (GX 10 at 2:18-22, 5:23, 8:9). CW-2 told the defendant that CS-2 would be prepared to deliver the cash the following week at a location outside of Honduras. (PSR ¶ 27; *see also* GX 10 at 3:5-17). The defendant told CW-2: "[Y]ou've been good to me, . . . and the appreciation I've always had for you . . . Look, I'd do anything for you. I'll go to the moon and back for you." (GX 10 at 8:1). Around the time of the May 11, 2015 call between the defendant and CW-2, CS-2 and the defendant began to communicate via BBM. (PSR ¶ 28). In those communications, the defendant agreed to meet CS-2 in Haiti on May 20, 2015. (PSR ¶ 29).

On May 20, 2015, the defendant traveled to Port-au-Prince, Haiti, and was arrested by Haitian authorities. (PSR ¶ 29). The defendant was subsequently expelled by Haitian officials, taken into custody by the DEA, and transported to the Southern District of New York. (*Id.*).

## <u>LEGAL STANDARD</u>

A *Fatico* hearing is the appropriate procedural mechanism for resolving disputes regarding the application of the Sentencing Guidelines and facts relevant to the statutory sentencing factors at Title 18, United States Code, Section 3553(a). *E.g.*, *United States* v. *Whiteside*, No. 13 Cr. 576, 2016 WL 3866580, at *1 (S.D.N.Y. July 13, 2016); *see also* Fed. R. Crim. P. 32(i)(3)(B); U.S.S.G. § 6A1.3. "The district court need only find disputed facts relevant to sentencing determinations by a preponderance of the evidence." *United States* v. *Nunez*, 547 F. App'x 65, 66 (2d Cir. 2013) (summary order) (citing *United States* v. *Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005)); *accord United States* v. *Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000). Moreover, the Federal Rules of Evidence do not apply. *E.g.*, Fed. R. Evid. 1101(d)(3). "For example, courts are not bound by rules governing hearsay, so long as the basis for the court's

determination has indicia of reliability and is not otherwise contrary to a defendant's due process rights." *United States* v. *Gilleo*, No. 15 Cr. 346, 2016 WL 1090614, at *4 (S.D.N.Y. Mar. 18, 2016).

## DISCUSSION

The Government will establish at the upcoming hearing that the applicable Guidelines range is life imprisonment, as calculated in the PSR, and that the balancing of the Section 3553(a) factors establishes the need for a substantial sentence commensurate with the scope of the defendant's crime.

The Probation Office calculated an offense level of 44—which is capped at 43—as follows:

- Pursuant to U.S.S.G. §§ 2D1.1(a)(5) and 2D1.1(c)(1), because the offense involved more than 450 kilograms of cocaine, the base offense level is 38;

- Pursuant to U.S.S.G. § 2D1.1(b)(1), two levels are added because a dangerous weapon was possessed during the offense;

- Pursuant to U.S.S.G. § 2D1.1(b)(11), two levels are added because the defendant bribed, and attempted to bribe, one or more law enforcement officials to facilitate the commission of the offense;

- Pursuant to U.S.S.G. § 2D1.1(b)(15)(C), two levels are added because an aggravating-role adjustment is appropriate, and because the defendant was directly involved in the importation of cocaine;

- Pursuant to U.S.S.G. § 3B1.1(b), three levels are added because the defendant was a manager or supervisor in criminal activity that involved five or more participants and was otherwise extensive; and

- Pursuant to U.S.S.G. § 3E1.1(a), a three-level reduction is warranted in light of the defendant's guilty plea.

(PSR ¶¶ 34-45). Based on that calculation, and Criminal History Category I, the applicable Guidelines range is life imprisonment. (*Id.* ¶ 83).

At the November 9, 2016 conference in this case, defense counsel explained that the disputed issues at sentencing include, from his perspective:  (i) the extent of the defendant's relationship with, and criminal conduct on behalf of, the *Cachiros*; and (ii) the application of the Guidelines enhancements related to drug quantity, the defendant's role in the offense, and firearms possession. (Tr. 3:21-24, 4:1-8, 5:4-5). The Government agrees that these issues should be resolved prior to the imposition of sentence, and will establish at the hearing that, between approximately 2009 and 2013, the defendant helped to cloak CW-2 and CW-3 with the impunity resulting from his family's political power, thereby contributing to the *Cachiros*' control in Honduras and facilitating the transportation of thousands of kilograms of cocaine into the United States.

The defendant helped manage relationships between the *Cachiros* and politicians, officials, and law enforcement at the highest levels of the Honduran government. In exchange for a total of approximately $70,000, an armored vehicle, and a machine gun, the defendant directly participated in the transportation of at least two cocaine loads with CW-2, once bringing with him armed military personnel acting at his direction to escort the drugs. He also enhanced the appearance of legitimacy for CW-2 and CW-3 in Honduras by helping to cause the Honduran government to issue contracts to at least one *Cachiros* front company, *INRIMAR*, in exchange for additional bribes. And when *OABI* determined to take action against CW-2 and CW-3 in September 2013—only after OFAC twice designated the *Cachiros*—the defendant helped CW-2 hide his assets. During the same period, the defendant facilitated drug-trafficking activities of

24

*diputado* Fredy Nájera Montoya, Miguel Pastor (one of the leaders of *SOPTRAVI*), and the Sinaloa Cartel in exchange for $50,000.  He also accepted a $100,000 bribe from Carlos Lobo.

The magnitude of these drug-trafficking activities and relationships cannot be understated.  CW-2, CW-3, and Lobo were some of the most successful drug traffickers in the world between 2009 and 2013; they were working with a small group of traffickers in Honduras, Colombia, Venezuela, and Guatemala, as well as with members of the Mexican Sinaloa Cartel, who were all operating on the same enormous scale.[13]  The defendant's awareness of these circumstances is demonstrated by the fact that he did not flinch when CW-2 told him that the last cocaine load he agreed to help with belonged to Chapo, the former leader of the Sinaloa Cartel and one of the most notorious drug traffickers on earth.[14]  The defendant was every bit as important to these operations as the boat captains, pilots, and police who physically handled the cocaine because, without support from the defendant and Honduran officials, criminality of this magnitude could not have continued, largely unfettered, for as long as it did.

---

[13] *See International Narcotics Trafficker Extradited from Honduras to United States Sentenced* (Dec. 9, 2014) (U.S. Attorney characterizing Carlos Lobo as "one of the most significant drug traffickers in Central America"), https://www.justice.gov/usao-sdfl/pr/international-narcotics-trafficker-extradited-honduras-united-states-sentenced (last accessed Feb. 28, 2017); *see also* OFAC, *Treasury Targets Honduran Drug Trafficking Organization and Its Network* (Aug. 20, 2014) ("The *Los Valles* drug trafficking organization is one of the most prolific Central American narcotics trafficking organizations."), https://www.treasury.gov/press-center/press-releases/Pages/jl2611.aspx (last accessed Feb. 28, 2017).

[14] *See* Mem. of Law in Support of Pretrial Detention at 2, *United States* v. *Guzman Loera*, No. 09 Cr. 466 (E.D.N.Y. Jan. 20, 2017) (dkt. no. 17) (characterizing Chapo as "the principal leader of the Mexico-based international drug trafficking organization known as the Sinaloa Cartel, which is the world's largest and most prolific drug trafficking organization").

Finally, the DEA's sting investigation and the resulting recordings not only corroborate the anticipated testimony of CW-2, but also demonstrate an escalation in the defendant's criminal intent.  After CW-2 and CW-3 began to cooperate, the defendant assumed an even more prominent role on behalf of the *Cachiros*.  Believing that CW-2 and CW-3 could no longer operate in the open following the OFAC designations and the *OABI* seizures, the defendant stepped in to coordinate the purported efforts of CS-1, CS-2, and CS-3 to send three more tons of cocaine to the United States.  He brought the sources to meetings with Honduran National Police, and introduced them to his military connections.  Tellingly, the defendant was so confident in his authority in Honduras—and his ability to facilitate large-scale drug-trafficking operations—that he brought CS-2 into a government office building, introduced him to General Pacheco, and argued with Pacheco that the three-ton drug load was "not much" when General Pacheco refused to expressly authorize a cocaine shipment proposed by CS-2, a man he had never met.  Just as telling, neither the defendant nor CS-2 was arrested in Honduras following that meeting, or the meetings with the Honduran National Police, or the meetings with Colonel Amaya.  This is because, as will be established at the hearing, the defendant's participation in staggering levels of corruption to facilitate large-scale drug trafficking in exchange for cash was one of his standard operating procedures.

## <u>CONCLUSION</u>

The Government anticipates offering evidence at the upcoming hearing, including through one or more witnesses, to establish the facts set forth herein, which support a Guidelines calculation of life imprisonment, and the need for a substantial sentence pursuant to Section 3553(a).

Dated: New York, New York
February 28, 2017

Respectfully Submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____
Emil J. Bove III
Matthew J. Laroche
Assistant United States Attorneys

Cc:    Defense Counsel
(Via Email)