UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

FABIO LOBO LOBO,

        Defendant.

15 Cr. 174-01  (LGS)

**DEFENDANT FABIO LOBO'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

RETURETA & WASSEM, P.L.L.C.

Manuel J. Retureta, Esq.
300 New Jersey Avenue, NW
Suite 900
Washington, D.C.  20001
*Defense Counsel for Fabio Lobo*

## INTRODUCTION

Mr. Lobo has admitted to participating in the narcotics conspiracy with which he was charged. He entered a guilty plea to the single count indictment pending on May 16, 2016 without having reached an agreement with the government.[1] Prior to Mr. Lobo's plea, the government offered a *Pimentel* letter reflecting its thoughts regarding Mr. Lobo's sentence guideline range. At the apparent request of the U.S. Probation Office, the government later expounded on those thoughts in a letter dated June 12, 2016. Mr. Lobo has rejected the analysis and conclusions set forth in both letters.

At his plea hearing, Mr. Lobo accepted responsibility for the charges set forth in the Indictment, specifically agreeing he committed the acts recited by the government: (1) that in late 2013 he "discussed drug trafficking activities with a cooperating defendant (now known to be Devis Leonel Rivera Maradiaga) who was working proactively in Honduras at the direction of the DEA;"[2] (2) that in early 2014 he agreed to participate in the safe passage of a load of cocaine intended to be imported the United States with two confidential sources also acting at the

---

[1] The Indictment [ECF 3] filed on March 18, 2015, charged Mr. Lobo with participating in a narcotics conspiracy from "at least in or about 2009, up to and including in or about July 2014" that had as its parts and objects: (1) the importation of five kilograms or more of a controlled substance into the United States in violation of 21 U.S.C. §§952(a), 960 (a)(1) and (b)(1)(B); and (2) the distribution of five kilograms or more of a controlled substance intending and knowing it would be imported into the United States in violation of 21 U.S.C. §§959(a), 960(a)(3) and (b)(1)(B). In addition, the Indictment contained a forfeiture allegation seeking forfeiture of all proceeds Mr. Lobo obtained as a result of the offense and all property used to commit and facilitate the commission of the offense.

[2] May 16, 2016 ("May 16") Tr. 16:21-23.

direction of the DEA in exchange for compensation;[3] (3) in furtherance of that agreement, he introduced those two confidential sources to a "high-ranking" Honduran government official, who declined to participate in the transaction;[4] (4) he participated in a meeting with the two confidential sources and Honduran police officials during which those police officials described their ability to provide security for the contemplated load of cocaine;[5] and (5) that he agreed to travel to Haiti in the Spring of 2015 he believed was due him as a result of the purported transaction.[6]

In the Indictment to which he pled, Mr. Lobo was charged with participating in a single conspiracy.  At Mr. Lobo's plea hearing, government counsel made a concerted effort to clarify that as far as the government was concerned the participants in that conspiracy were Mr. Lobo and certain Honduran National Police officials with whom he met in 2014.  At that hearing, the following exchange occurred:

> THE COURT:  Mr. Bove, do you believe that there's sufficient factual predicate for a guilty plea?
>
> MR. BOVE:  I do your Honor, subject to one clarification.
>
> THE COURT:  Yes.
>
> MR. BOVE:  Because, as I described, there were individuals involved in this purported transaction that were acting at the direction of law enforcement, I want to be clear that the government's position regarding

---

[3] May 6 Tr. 16:23-17:11.

[4] May 6 Tr. 17:12-16.

[5] May 6 Tr. 17:16-23.

[6] May 6 Tr. 17:24-18:2.

> participants in the conspiracy, for the purposes of this
> guilty plea, it that it included the defendant, as well as
> the police officials that I described.[7]

While Mr. Lobo accepted responsibility, he has consistently disputed that certain sentencing factors and enhancements proposed by the government apply. Specifically, Mr. Lobo disputes the following specific offense characteristics and/or enhancements: (1) that he possessed a dangerous weapon; (2) that he bribed or attempted to bribe a law enforcement official; (3) that he was directly involved in the importation of a controlled substance; and, (4) that he was a manager or supervisor.

In its Proposed Findings of Fact and Conclusions of Law [ECF 140], the government contends that it established certain facts that support its Guidelines range argument by a preponderance of the evidence through Rivera Maradiaga's testimony, recordings and photographs.[8]   As set forth more fully below, Mr. Lobo submits that Rivera Maradiaga was a wholly unreliable witness who committed perjury, offered inconsistent statements and exhibited the demeanor of one who was not credible.   As Rivera Maradiaga's testimony is unworthy of proper reliance, therefore, the government has failed to meet its burden with regard to any and all facts it has attempted to prove using Rivera Maradiaga.

As Mr. Lobo's dispute for the purposes of his appropriate Guidelines range relates to the four specific offense characteristics and/or enhancement set forth

---

[7] May 16 Tr. 20:18-21:4.

[8] ECF 140 at 1.

above, he shall limit his proposed Findings of Facts to facts related thereto, as well as facts supporting his plea.[9]

## PROPOSED FINDINGS OF FACT

Mr. Lobo respectfully submits that the following facts have been established by a preponderance of the evidence:

### A.   *Rivera Maradiaga*

1.      Rivera Maradiaga was one of two brothers who led a violent drug trafficking organization known as "Los Cachiros." (Defense Exhibit 3.)

2.      On April 14, 2016, Rivera Maradiaga entered a guilty plea to a Superseding Information (Defense Exhibit 3) before another judge of this Court in Case No. 13-cr-413 (JGK).[10]

3.      As part of his plea, Rivera Maradiaga has admitted to engaging in a continuing criminal enterprise from 2003 up to and including "about 2013," having a role in no less than seventy-eight murders, participating in a narcotics conspiracy intending and knowing more than five kilograms of cocaine would be imported into the United States, committed money laundering, using and carrying a machine gun and "destructive device," and other crimes.  (Defense Exhibit 3.)

4.      Among the murders for which he accepted responsibility, Rivera

---

[9] While Mr. Lobo also disputes the amount of drugs that should be included in his relevant conduct, for the purposes of his Guideline range calculation he admits the amount is more than 450 kilograms of cocaine.

[10] See docket for Case No. 13-cr-413 (JGK) before the United States District Court for the Southern District of New York.

Maradiaga admitted having a role in the assassination of General Julian Aristides Gonzalez, Honduras' drug czar. (Defense Exhibit 3, Appendix A.)

5.     Rivera Maradiaga admitted murdering twenty-five of the seventy-eight individuals listed as part of his plea agreement because they were "suspected" of some act or role.  (Defense Exhibit 3, Appendix A.)

6.     In September of 2013, the Office of Foreign Assets Control added "Los Cachiros," Rivera Maradiaga, members of his family and certain companies run by Rivera Maradiaga's family to its "Specially Designated Nationals" list. [11] (Defense Exhibit 2.)

7.     The Honduran government seized some of Rivera Maradiaga's assets on September 19, 2013.[12] (Mar. 6 Tr. 73:7-8.)

8.     Following his OFAC designation and seizure of his assets, Rivera Maradiaga decided he would turn himself in to United States law enforcement and began recording meetings with Mr. Lobo and others in anticipation of attempting to cooperate with the DEA.  (Mar. 6 Tr. 68:23-71:11, 73:9-75:18.)

9.     Four of the murders for which Rivera Maradiaga accepted responsibility occurred after his assets had been seized and while he was preparing to turn himself in.  (Defense Exhibit 3, Appendix A.)

10.     The very last murder for which Rivera Maradiaga accepted

---

[11] OFAC'S designation was published on or before September 19, 2013.  *See* "US Pushes Honduras to Crack Down on Cachiros," Steven Dudley, September 19, 2013; < http://www.insightcrime.org/news-analysis/us-treasury-names-names-sort-of-in-honduras-case>.

[12] As Reuters reported, Rivera Maradiaga's assets were seized on September 19, 2013.  *See* "Honduras Seizes Assets of Suspected Drug Gang, Including Zoo," September 20, 2013.

responsibility occurred in Canada during November 2013, well after he had decided to turn himself in and no more than a few weeks before he met with federal prosecutors and DEA agents to begin cooperating.  (Defense Exhibit 3, Appendix A; Mar. 6 Tr. 75:25-76:1).

11.    Rivera Maradiaga has admitted responsibility for more than twenty tons of cocaine during a single four-year period between 2009 and 2013, a figure provided to him by the government.  (Mar. 6 Tr. 13:5-10).

12.    Rivera Maradiaga was unable to recall how many additional kilograms of cocaine his drug trafficking organization moved during the remainder of its existence.  (Mar.16 Tr. 33:20-34:11).

13.    Rivera Maradiaga established Inmobiliaria Rivera Maradiaga SA de CV ("INRIMAR") on June 3, 2009 in Tegucigalpa, Honduras and listed himself as "President" of the company in its organizing instrument. (First Supplement to Defendant Fabio Lobo's Response to the Government's Pre-Hearing Memorandum [ECF 147], Exhibit A at 1, 11).

14.    INRIMAR was registered with the "Camara De Comercio E Industria De Tegucigalpa" on June 10, 2009. (ECF 147, Exhibit B).

14.    Public notice of INRIMAR's formation was published in a Honduran newspaper.  (ECF 147, Exhibit C).

15.    At all times pertinent to INRIMAR's formation, Manuel Zelaya was the president of The Republic of Honduras.[13]

---

[13] *See* "Honduran President is Ousted in Coup," *The New York Times*, June 28, 2009.

16.     Porfirio Lobo Sosa was elected president of The Republic of Honduras in November of 2009.[14]

17.     Mr. Lobo Sosa assumed the office of President of Honduras on January 27, 2010.[15]

16.     Rivera Maradiaga lied under oath when he claimed he formed INRIMAR at Porfirio Lobo Sosa's urging after he assumed office as president of The Republic of Honduras. (Mar. 6 Tr. 30:14-21 ("Q:  I think you said that [President Lobo Sosa] asked you to set up a company to receive the contracts? A: Yes.  Q:  Did you do that?  A:  Yes.  Q:  What was the name of the company that you set up for that purpose?  A:  INRIMAR."); Mar. 16 Tr. 25:13-21 ("Q:  When was INRIMAR created?  A:  When Pepe Lobo recommended that we set it up, sir.  Q:  When was that? A:  In 2009.  Q:  When in 2009?  A:  I don't remember the exact date.  Q:  Was it the beginning of 2009?  The end of 2009?  A:  It was after Pepe Lobo's recommendation, it was after he became president, sir."))

## B.     *Drug Trafficking*

17.     In 2012, Mr. Lobo agreed to assist Rivera Maradiaga with the transportation of a 400-410 kilogram load of cocaine.

18.     Rivera Maradiaga instructed Mr. Lobo to come to San Pedro Sula and call him when he had arrived; Mr. Lobo complied (Mar. 6 Tr. 41:22-42:24).

19.     When Mr. Lobo called, Rivera Maradiaga instructed him to travel to

---

[14] *See* "Nation's Divided on Recognizing Honduran President-Elect," CNN, November 30, 2009.

[15] *See* "Nation's Divided on Recognizing Honduran President-Elect," CNN, November 30, 2009.

the Playa Hotel in Puerto Cortes and bring his security detail because they were going to transport drugs (Mar. 6 Tr. 42:25-43:11).

20.     Rivera Maradiaga picked Mr. Lobo up at the Playa Hotel and they traveled to the Pan-American Highway (Mar. 6 Tr. 43:12-16; 45:17-20).

21.     Rivera Maradiaga and Mr. Lobo traveled together in a separate vehicle while a truck carrying 400-410 kilograms of cocaine traveled near them on its way to San Pedro Sula (Mar. 6 Tr. 45:17-22; 46:3-10).

22.     At San Pedro Sula, Rivera Maradiaga and Mr. Lobo parted ways (Mar. 6 Tr. 46:6-10).

23.     In approximately 2012 or 2013, Mr. Lobo met with Fredy Najera Montoya, Miguel Pastor two drug traffickers and others.  (PSR ¶13).

24.     During their first meeting, Fredy Najera Montoya explained a proposed drug transaction to Mr. Lobo and Miguel Pastor.  (PSR ¶14).

25.     During a subsequent meeting in San Pedro Sula, Mr. Lobo, Fredy Najera Montoya, Miguel Pastor and others further discussed the proposed transaction and that it would culminate in the importation of at least some of the drugs into the United States.  Mr. Lobo was paid approximately $50,000.00 for his participation in the meetings.  (PSR ¶15).

## C.     DEA Sting

26.     On December 14, 2013, at the direction of the DEA, Rivera Maradiaga recorded a meeting with Mr. Lobo during which Rivera Maradiaga requested assistance in connection with the transportation of a load of cocaine to be sent via a

maritime route from Colombia to Honduras. (GX 1 at 4:13-21; GX 1-A (still image from recording).

27.     During the December 14, 2013 meeting, Rivera Maradiaga told Mr. Lobo that Honduran authorities had taken all of his properties so he need to keep "working his ass off," and Mr. Lobo responded, "there's no other option." (GX 1 at 4:9-11).

28.     Rivera Maradiaga asked Mr. Lobo how many cars he had with him and how many were on his security detail, to which Mr. Lobo replied, "2" and "the same," respectively.  (GX 1 at 8:17-9:5).

29.     Rivera Maradiaga then specifically asked whether specific individuals were still part of Mr. Lobo's security detail and told him to "take the ones you trust the most."  (GX 1 at 9:7-10:1).

30.     Mr. Lobo agreed to assist Rivera Maradiaga with the proposed transaction. (GX 1 at 4:1-19).

31.     On March 8, 2014, Mr. Lobo met with Rivera Maradiaga and a confidential source posing as a Mexican drug trafficker in a hotel in San Pedro Sula to discuss a drug transaction.  (GX 2; GX 2-A).

32.     On May 17, 2014, Mr. Lobo met with Rivera Maradiaga and two other confidential sources posing as Mexican drug traffickers in San Pedro Sula regarding a proposed drug transaction.  (GX 3; GX 3-A).

33.     During the course of that May 17th meeting, Mr. Lobo agreed to assist the Mexicans in the transportation of their shipment in exchange for a financial

interest therein.  (GX 3).

34.     On May 18, 2014 Mr. Lobo once again met with the confidential sources posing as Mexican drug traffickers to discuss the same proposed transaction, and the confidential sources requested an introduction to a Honduran general.  (GX 4).

35.     In late June 2014, Mr. Lobo met with the two confidential sources and several former members of the Honduran National Police.  (GX 5).

36.     During that June 2014 meeting, the confidential sources explained the proposed transaction involved a cocaine shipment destined for the United States and the Honduran National Police officers described the best routes for transporting the shipment using a map of Honduras.  (GX 5).

37.     In exchange for their assistance with the drug shipment, the members of the Honduran National Police requested $100,000.00 each.  (GX 5).

38.     In late June 2014, Mr. Lobo unsuccessfully attempted to introduce the two confidential sources to a meeting with a Honduran general; the general abruptly walked out of the room after Mr. Lobo began describing a drug shipment. (GX 6).

39.     On June 26, 2014, Mr. Lobo met with Colonel Amaya, Jose Antonio Funez Lisser (an associate of Rivera Maradiaga's) and the two confidential sources to discuss the same proposed drug transaction.  (GX 7).

40.     Mr. Lobo was arrested in Haiti on May 20, 2015 as part of the proposed drug transaction.  (GX 10; PSR ¶29).

## LEGAL STANDARD

It is well settled that district courts retain wide authority to determine relevant conduct for the purposes of sentencing by a preponderance of the evidence. *United States v. Vaughn*, 430 F.3d 518, 525 (2d Cir. 2005). *See also United States v. Gonzalez*, 407 F.3d 118, 125 (2d Cir. 2005) (district courts retain authority post-*Booker* to resolve disputed facts by a preponderance of the evidence when determining a Guidelines sentence).

A sentencing court is not bound by strict adherence to the Federal Rules of Evidence. A long history of the wide discretion afforded a sentencing judge and a "recognition of the need for individualized sentencing" led the Supreme Court to conclude that sentencing courts may properly seek information from out-of-court sources to "guide their judgment toward a more enlightened and just sentence." *Witte v. United States*, 515 U.S. 389, 398 (1995) (citing *Williams v. New York*, 337 U.S. 241, 246 (1949). "As a general proposition, a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Nichols v. United States*, 511 U.S. 738, 747 (1994) (citation and internal quotation marks omitted). Sentencing judges are not restricted in the information they may consider. "Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy." *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998) (citation and internal quotation marks omitted).

The Sentencing Guidelines themselves instruct that "[w]hen any factor important to the sentencing determination is reasonably in dispute," a sentencing court "may consider relevant information without regard to its admissibility," provided that information "has sufficient indicia of reliability to support its probable accuracy." U.S. Sentencing Guidelines Manual §6A1.3(a) (U.S. Sentencing Comm'n 2016). In fact, the Second Circuit has held that the written statements of counsel alone may be adequate evidence under certain circumstances. *United States v. Ibanez*, 924 F.2d 427 (2d Cir. 1991).

Finally, courts are endowed with great discretion to make credibility determinations regarding witnesses presented at hearings to resolve sentencing disputes. A sentencing court's credibility determinations will only be disturbed if clearly erroneous. *United States v. McLean*, 287 F.3d 127, 133 (2d Cir. 2002). *See also United States v. Guang*, 511 F.3d 110, 123 (2d Cir. 2007) ("We give strong deference to findings based on credibility determinations.").

13

## CONCLUSIONS OF LAW

Mr. Lobo will focus his conclusions of law on the four specific offense characteristics and/or enhancement set forth below, as well as Rivera Maradiaga's lack of credibility.

### *Rivera Maradiaga's Credibility*

To support many of its sentencing arguments, the government has chosen to rely upon the word of a single notorious drug trafficker, Devis Leonel Rivera Maradiaga. Rivera Maradiaga and his brother led a violent and tightly-run drug trafficking organization known as "Los Cachiros," which counted Rivera Maradiaga's immediate family as members of its upper-level ranks. Despite being family-run, it was anything but small. Conservative estimates place the DTO's net worth in late 2015 at between $800 million and $1 billion.[16]

At part of his plea before another judge of this Court, Rivera Maradiaga admitted participating in no less than 78 murders – including the assassination of General Julian Aristides Gonzalez, Honduras' drug czar, considered by many to be a national hero. (Defense Exhibit 3, Appendix A). Rivera Maradiaga attempted to mitigate his exposure for those murders, testifying that he didn't kill those 78 individuals, but rather "caused" their murders. (Mar. 6 Tr. 11:14-17; Mar. 16 Tr. 21:1-3). As Mr. Lobo has previously stated, that is a distinction without a difference. Rivera Maradiaga was cold-blooded and far from restrained in his use of

---

[16] *See* "Cachiros" at http://www.insightcrime.org/honduras-organized-crime-news/cachiros-profile.

violence.   He acted as judge, jury and executioner for at least twenty-five individuals, who were listed on the Appendix to his plea agreement as merely "suspected" of something.  (Defense Exhibit 3, Appendix A).  Of note, four of the murders listed in that Appendix were committed after he had decided to turn himself in to United States law enforcement. (Defense Exhibit 3, Appendix A at p.3; Mar. 6 Tr. 68:23-71:11, 73:9-75:18).   Incredibly, the very last murder he admitted involvement in was that of the mother of his brother's child while she was located in Canada *during November 2013* – well after he decided to cooperate and no more than a few weeks before he first met with federal prosecutors and DEA agents to begin the cooperation he hoped would spare him a possible sentence of multiple terms of life in a United States prison.  (Defense Exhibit 3 at pp. 1-3 and Appendix A; Mar. 16 Tr. 21:18-22:3).

With regard to narco-trafficking, Rivera Maradiaga admitted the "Los Cachiros" DTO was responsible for more than twenty tons of cocaine during a single four-year period between 2009 and 2013.  (Mar. 6 Tr. 13:5-10).  Notably, that was the same answer he gave when asked the amount of cocaine his DTO had moved during its entire existence, beginning years before 2009.[17]  Mr.  Lobo maintains that

---

[17] When asked during cross-examination how many kilograms of cocaine his organization had moved during its existence, he didn't remember:

> Q:     Do you have any idea how many kilos, you, your brother, your family, your organization moved?
>
> A:     Around 20 tons and more, sir.
>
> Q:     How much more?
>
> A:     I don't have the exact date.  I don't remember.

his testimony reflects Rivera Maradiaga grossly understated the amount of cocaine for which his organization was responsible, both during the four-year period highlighted by the government, as well as its extended lifespan.

As the Court is well aware, Rivera Maradiaga's most of allegations were uncorroborated.  Mr. Lobo submits Rivera Maradiaga's word alone should be treated with great caution and is not sufficient to prove any fact by a preponderance of the evidence.  Over and over again, Rivera Maradiaga was unable to recall simple, but important, details unaided.  More importantly, he perjured himself before this Court.

When asked for an estimate of the drugs "Los Cachiros" helped to distribute, Rivera Maradiaga was unable to provide a real estimate without the help of government counsel.  (Mar. 6 Tr. 13:5-10).  He required prompting from government counsel regarding dates of events about which he testified. (See e.g., Mar. 6 Tr. 16:8-13; 24:3-7 (which drew an objection and a request from the Court that government counsel prompt Rivera Maradiaga to be more precise); 37:17-19; 39:25-40:4; 41:25-42:5; 55:7-13; 55:17-19; 57:20-23; 68:23-69:6; 83:23-25).  Throughout his testimony, it was necessary for government counsel to ask him leading questions to which he

---

          \*      \*      \*      \*      \*

Q:    So, the best number that you can give us is … 20 tons?  That's the best estimate you can give us as to the amount of cocaine that your organization moved throughout is entire existence?

A:    Yes, sir.

Q:    Forgive me, but doesn't that seem low?

A:    I don't have the exact number.  I don't remember.

Mar. 16 Tr. 33:20-34:11.

frequently answered simply, "yes" or "yes, sir." Troublingly, he declined to estimate whether the proceeds "Los Cachiros'" received as a result of their drug trafficking was closer to $2 million or $300 million. (Mar. 16 Tr. 32:19-33:1).   Incredibly, he even claimed that he did not know whether his family was involved in the drug trafficking conspiracy for which he pleaded guilty before this Court. (Mar, 16 Tr. 15:11-14).

Moreover, Rivera Maradiaga admitted during his testimony that he participated in joint debriefings with his brother. (Mar. 16 Tr. 15:4-16:11). Upon information and belief, those joint debriefings occurred on at least fifteen (15) occasions. According to Rivera Maradiaga, when given the opportunity, he and his brother consulted and advised each other with regard to their cooperation with law enforcement. (Id.) Over the course of the more than one year they were cooperating and not incarcerated, they certainly had more than ample opportunity to confer in order to get their stories straight.

At every opportunity, Rivera Maradiaga has made exhaustive efforts to minimize his responsibility for criminal actions.   Before this Court, Rivera Maradiaga felt it necessary to clarify that he only "caused" the deaths of the 78 people that he had accept responsibility for murdering.  To be clear, by "causing" those killings, Rivera Maradiaga's hands are just as bloodied as they would be had he pulled the trigger himself.  In addition, Rivera Maradiaga, the leader of a major drug trafficking organization, was unable to give any estimate of the amount of cocaine "Los Cachiros" moved from 2009 through 2013, answering "many tons"

when asked during direct examination. In fact, it was government counsel who provided the number later relied upon during the *Fatico* hearing:

> Q:     Between 2009 and 2013, what is your best estimate of the amount of cocaine that you and the Cachiros helped to distribute?
>
> A:     Many tons of cocaine.
>
> Q:     More than 20 tons?
>
> A:     Yes, sir.  More.

(Mar. 6 Tr. 13:5-10).

As the leader of his DTO, Rivera Maradiaga knew how much "Los Cachiros" received per kilogram of cocaine transported as payment for its services; yet, he was unwilling to place a figure on the total proceeds it received as a result of its drug trafficking.  Using even just 20 tons as the amount of drugs and the lower range of $2000/kilo Rivera Maradiaga provided when discussing his 400-kilo deal (Mar. 6 Tr. 46:14-19), a conservative estimate of those proceeds would be more than $36 million.  Given that he admitted "Los Cachiros" transported "more" than 20 tons of cocaine, in reality that number was far greater.  Mr. Lobo submits that Rivera Maradiaga was well aware that "Los Cachiros" received tens, if not hundreds, of millions of dollars for their services and the only reason he feigned ignorance was to limit his sentencing exposure.[18]

Although the government has attempted to present Rivera Maradiaga as unwavering, that portrayal is far from accurate.  As previously noted, throughout

---

[18] According to the docket for Rivera Maradiaga's case (13-cr-413 (JGK)), he is scheduled to be sentenced tomorrow, April 14, 2017.

his direct examination, it was necessary for government counsel to ask leading questions in order to elicit the desired response.  Even so, Rivera Maradiaga was less than forthcoming and simply responded in the affirmative.  Under the rigors of cross-examination, Rivera Maradiaga invoked the phrase, "I don't remember," or negatively answered a question beginning with the phrase, "Do you remember," on no less than thirteen occasions – including when asked whether his assets were subject to forfeiture pursuant to his plea agreement. (Mar. 16 Tr. 31:15-19).

Most importantly to this Court's credibility determination, Rivera Maradiaga committed perjury during his testimony.

On direct, Rivera Maradiaga testified that sometime after January 27, 2010,[19] President Lobo Sosa requested he form a company to receive government contracts:

> Q:  I think you said that [President Lobo Sosa] asked you to set up a company to receive the contracts?
>
> A:  Yes.
>
> Q:  Did you do that?
>
> A:  Yes.
>
> Q:  What was the name of the company that you set up for that purpose?
>
> A:  INRIMAR.

---

[19] Rivera Maradiaga testified he met with President Lobo Sosa "after he became president of Honduras." (Mar. 6 Tr. 26:20-22).  Mr. Lobo Sosa assumed the presidency on January 27, 2010.  *See* "Nation's Divided on Recognizing Honduran President-Elect," *supra*.  Even assuming that Rivera Maradiaga intended to convey that the meeting occurred after President Lobo Sosa was elected, however, the earliest it would have occurred was November 30, 2009.

(Mar. 6 Tr. 30:14-21).

During cross-examination, Rivera Maradiaga was even more adamant in his assertion INRIMAR was established sometime after January 27, 2010:

> Q:    …When was INRIMAR created?
>
> A:    When Pepe Lobo recommended that we set it up, sir.
>
> Q:    When was that?
>
> A:    In 2009.
>
> Q:    When in 2009?
>
> A:    I don't remember the exact date.
>
> Q:    Was it the beginning of 2009?  The end of 2009?
>
> A:    It was after Pepe Lobo's recommendation, it was after he became president, sir.

(Mar. 16 Tr. 25:13-21).  Quite simply, Rivera Maradiaga lied.

According to the official records of the Republic of Honduras, Inmobiliaria Rivera Maradiaga SA de CV ("INRIMAR") was established on June 3, 2009 – approximately six months before President Lobo Sosa was elected and almost eight months before he became president.[20]   The records further reflect that INRIMAR registered with the appropriate government agency ("Camara De Comercio E

---

[20] A copy of INRIMAR's organizing instrument was attached to ECF 147 as Exhibit A.

Industria De Tegucigalpa") on June 10, 2009.[21]   As required, public notice of INRIMAR's formation was published in a Honduran newspaper.[22]

INRIMAR's organizing instrument reflects that Rivera Maradiaga himself appeared as an "Empresario" ("Businessman") and was designated therein as the President of the company.[23]   According to the official records of the registering agency, approximately eighteen months later, Rivera Maradiaga assumed the role of Commissioner and his brother, Jose Angel Maradiaga, became President of INRIMAR.[24]

Contrary to Rivera Maradiaga's testimony, at the time INRIMAR was formed, Manuel Zelaya was the president of Honduras.  Mr. Zelaya, a leftist aligned with the former president of Venezuela, Hugo Chávez, was ousted in a coup d'état a little less than a month later on June 28, 2009.[25]

Clearly, Rivera Maradiaga presented false testimony before this Court. Obviously, he also lied to the government.  The government has relied heavily upon that falsehood.[26]  The premise that Rivera Maradiaga had only set up INRIMAR at

---

[21]  A copy of the receipt for INRIMAR's registration was attached to ECF 147 as Exhibit B.

[22]  A copy of the notice published was attached to ECF 147 as Exhibit C.

[23]  See ECF 147, Exhibit A at 1, 11.

[24] A March 30, 2017 search of the registering agency's index for "Inmobiliaria Rivera Maradiaga S.A. De C.V." was attached to ECF 147 as Exhibit D.  See Exhibit D at 1.  Thereafter, Rivera Maradiaga's brother was replaced as President by Efrain de Jesus Maradiaga Turcios on January 30, 2012. Maradiaga Turcios himself was later replaced by Luis Manuel Turcios Galeas, and Rivera Maradiaga's brother, Jose Angel Maradiaga, returned as INRIMAR's Secretary on June 10, 2013. See Exhibit D at 1-2.

[25] *See* "Honduran President is Ousted in Coup," *The New York Times*, June 28, 2009.

[26] *See, e.g.,* Government's Proposed Findings of Fact and Conclusions of Law Relating to Defendant Fabio Porfirio Lobo at ¶25, p.9.

the suggestion of President Lobo Sosa, and that it was formed after President Lobo Sosa had been (at the very least) elected, was central to the government's bribery theory. It was also the cornerstone upon which it built the support for the remainder of its requested sentencing enhancements. As a result of Rivera Maradiaga's false testimony, the very foundation of those requests has failed.[27]

Moreover, the fact that Rivera Maradiaga committed perjury, in and of itself, is absolute evidence that he wholly lacks credibility as to any of his testimony. If he had the audacity to lie about something that one could independently investigate through official government records, it is almost a certainty that he lied about other events, conversations, etc. that are impossible to independently verify, which the government has asked the Court to accept as true based merely upon Rivera Maradiaga's word.

As Rivera Maradiaga is clearly not credible, Mr. Lobo submits that all of his testimony is unreliable and cannot serve as a basis upon which to find that the government has met its burden that the support for its requested sentencing has been proven beyond a reasonable doubt.

---

[27] Mr. Lobo rejects the government's recent contention that the official INRIMAR documents are inconsequential because Rivera Maradiaga was only "off" by a few months. The relevant consideration is not about whether he misremembered a date; it's about him lying under oath about his motivation for founding his company. He has clearly violated his agreement with the United States to testify truthfully.

***Weapon Enhancement Pursuant to U.S.S.G. §2D1.1 (b)(1)***

The weapon enhancement found in §2D1.1 (b)(1) of the Guidelines calls for a guideline enhancement when a weapon is possessed. While "possession" under this section is one question, the issue of whether or not the weapon was connected to the offence is also called into question. As noted in the section's notes, the enhancement should be applied if a weapon was present "unless it is improbable that the weapon was connected to the offense." U.S.S.G. § 2D1.1 cmt. n. 3. *See also* U.S.S.G., *Application of Subsection (b)(1)*("Firearm" and "dangerous weapon" are defined in the Commentary to §1B1.1 (Application Instructions). Applying the element of possession and the improbability that a weapon linked to Mr. Lobo would be linked to drug trafficking, the government has failed to meet their burden as to this enhancement.

The government evidence, through the testimony of witness Rivera Maradiaga, confirms that it was improbable that the possession or presence of weapons was connected with the drug offense. *United States v. Smythe,* 363 F.3d 127, 128 (2d Cir. 2004), citing *United States v. Smith,* 215 F.3d 237, 239 (2d Cir. 2000)(per curiam). Rather, per the testimony of Rivera Maradiaga, Mr. Lobo's role was to provide logistics, safe passage for illegal controlled substances.

By the government witness' own words, Mr. Lobo did not possess a weapon, or firearm, at anytime during the relevant conduct; therefore, such an enhancement is not applicable since not possession is established. *Rivera v. United States,* 893 F. Supp. 1238, 1243 (S.D.N.Y 1995)("The Sentencing Commission's use of the term

"possess" in both §2D1.1(b)(1) and the accompanying commentary makes clear that the upward adjustment applies to a defendant who is in possession of a gun during the offense even if he does not hold actual title to the gun.).

Rather than possession a weapon to distribute illegal narcotics, testimony from government witness Rivera Maradiaga clearly established that Mr. Lobo's sole, and very specific, role was to use his name and face as a means to assure the movement of drugs. (Mar. 6 Tr. 65:11-17). At no point during his testimony did Rivera Maradiaga testify that he, or his operation, relied upon Mr. Lobo and his possession of a weapon to further their drug operation.

Glossed over by Rivera Maradiaga was the fact that as a family member of the country's president, Mr. Lobo had an assigned security detail. It was this security detail that accompanied Mr. Lobo at all times. (Mar. 6, Tr. 59:7-11). However, nothing in Rivera Maradiaga's testimony supported that the security detail and their weapons were present for the purposes of drug trafficking. Rather, it was the name and face of Mr. Lobo that the Cachiros sought to employ and take advantage of as they carried out their drug trafficking. *See* Mar. 6 Tr. 65:11-17.

Furthermore, Mr. Lobo should not be held responsible for weapons attributed to the Cachiros DTO as argued by the government. There is absolutely no evidence to support any knowledge by Mr. Lobo as to what he personally knew about the Cachiros arsenal, nor any testimony of possession of such weapons on his part. Additionally, the alleged violence in the country of Honduras is also an unsubstantiated argument by the government. Nothing in the testimony of Rivera

24

Maradiaga supports, let alone discusses, that the level of crime in the country had a direct correlation to the weaponization of the society, let alone specific responsibility to Mr. Lobo.

***Bribery Enhancement Pursuant to U.S.S.G. §2D1.1(b)(11)[28]***

As set forth below, Mr. Lobo maintains that even had he bribed Honduran law enforcement officials, §2D1.1(b)(11) would not apply.   Moreover, even were the Court to determine §2D1.1(b)(11) was applicable, Mr. Lobo submits the government has not met its burden of proof.

U.S.S.G. §2D1.1(b)(11) provides for a two-level sentencing enhancement  "[i]f the defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense."  The background commentary to §2D1.1 elucidates, "Subsection (b)(11) implements the directive to the Commission in section 6(1) of [the Fair Sentencing Act of 2010]."  U.S.S.G. §2D1.1, cmt. (backg'd).  In the Fair Sentencing Act of 2010, Congress directed the United States Sentencing Commission to amend the federal sentencing guidelines to apply a two-level sentencing enhancement "if – (1) the defendant bribed, or attempted to bribe, a *Federal, State, or local law enforcement official* in connection with a drug trafficking offense."  Public Law 111-220, 124 Stat. 2372, §6(1). (Emphasis added.)

---

[28] Contrary to the government's recent contention, Mr. Lobo is not now raising an objection to its request for a two-level increase pursuant to U.S.S.G. §2D1.1(b)(11) for the first time.   In fact, Mr. Lobo advised the Court of that objection in his request for a *Fatico* hearing.  *See* Request for *Fatico* Hearing dated November 1, 2016 [ECF 76] at 1.

In the absence of an indication to the contrary, reading an extraterritorial effect into §6(1) and, by extension, §2D1.1(b)(11) is inappropriate.  Recognizing its limitations as a domestic body, Congress has rarely extended its legislative reach beyond the territorial limits of the United States.  In light of Congress's reluctance, the rules of legislative interpretation require restraint.  The Supreme Court has made clear that legislation enacted by Congress is presumed to have only domestic applications, unless a contrary intent is apparent.  *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010).  "Thus, unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions….When a statute gives no clear indication of an extraterritorial application, it has none."  *Id.* (Internal citations omitted.)

While §2D1.1(b)(11) itself is silent as to whether it is limited only to domestic law enforcement, its background commentary explains the provision merely implements the directive of §6(1) of the Fair Sentencing Act (Public Law 111-220, 124 Stat. 2372).  In §6(1) Congress provided clear parameters for the Guidelines amendment it contemplated:  a two-level increase where a defendant had bribed a member of *domestic* law enforcement.   Its modification of the term "law enforcement" to include Federal, State or local officials must not be ignored.  The language of §6(1) expressly limits itself to domestic law enforcement and plainly reflects that Congress did not intend for the Guidelines amendment it directed to

apply to conduct occurring on foreign soil unrelated to law enforcement officials from the United States.

The intent of Congress to limit the enhancement only to bribery of domestic law enforcement becomes even more apparent when considered in light of the remainder of the Fair Sentencing Act.  Elsewhere within the statute, Congress specifically expressed its intent that certain provisions had extraterritorial effect. *See, e.g.,* Public Law 111-220, 124 Stat. 2372, §§2(b), 4(b) (increasing penalties for importation of controlled substances).  Indeed, within §6 itself Congress expressed certain extraterritorial conduct was deserving of a Guidelines increase.  *See* Public Law 111-220, 124 Stat. 2372, §6(3)(B)(iii) (discussing "super-aggravating" factors). The failure of Congress to include bribery of foreign law enforcement officials in §6(1), therefore, was clearly not an oversight.

Clearly, even were the government's allegations Mr. Lobo bribed Honduran law enforcement officials true, the plain language of the Fair Sentencing Act reflects the enhancement set forth in §2D1.1(b)(11) would not be applicable.  The government's argument for a two-level increase in his Guidelines level, therefore, must be rejected as wholly without merit.

The government has failed to meet its burden as to this enhancement.  Were the Court inclined to extend the reach of §2D1.1(b)(11) beyond its statutory limitations, however, Mr. Lobo submits the government has failed to meet its evidentiary burden to prove a two-level sentencing enhancement is appropriate.

27

The government has chosen to rely, almost entirely, upon the testimony of Rivera Maradiaga to support its request for a two-level bribery enhancement.  For the reasons set forth above, it is clear that such reliance is misplaced.  Rivera Maradiaga is far from credible.  Despite facing "powerful incentives to testify truthfully,[29]  Rivera Maradiaga lied under oath and contradicted himself.  His decision to commit perjury, as well as his inconsistent statements, overall demeanor, and lack of candor, rendered his testimony wholly unreliable.  Where the government has relied solely upon Rivera Maradiaga's word to support its sentencing requests, therefore, it has failed to meet its burden of proof.

Based solely upon Rivera Maradiaga's testimony, the government alleges Mr. Lobo bribed a Honduran general and intended to do so again in the future.[30]  As no other evidence was presented to support those allegations and Rivera Maradiaga was clearly not credible, the government has failed to meet its burden of proof because no reliable evidence has been presented that such bribes occurred.  Even were Rivera Maradiaga's testimony accepted at face value, however, it still would be woefully insufficient.  He never claimed to witness Mr. Lobo paying a bribe to the general or that the general had told him he had received any such bribe.  Rivera Maradiaga merely asserted that Mr. Lobo sought additional money to give to "the boss" (Mar. 6 Tr. 67:16-21).  Without providing any basis for his assertion, Rivera Maradiaga stated he understood "the boss" to refer to the general (Mar. 6 Tr. 67:22-

---

[29] Government's Proposed Findings of Fact and Conclusions of Law [ECF 140] at 40.

[30] ECF 140 at 50.

24).  As no evidence was presented to support or explain that assertion, it alone is insufficient to prove that Mr. Lobo bribed a law enforcement official – even under a preponderance of the evidence standard.

Further, Mr. Lobo submits the videotaped meeting of June 25, 2014 is not evidence that he attempted to bribe members of the Honduran National Police, as the government suggests.[31]  Rather, accepting the government's characterization of the video for the purposes of argument, it is direct evidence those police officers entered into a narcotics conspiracy as active participants "to provide security for the drug shipment."[32]  As government counsel made clear at Mr. Lobo's plea hearing, its position regarding the participants in the conspiracy to which Mr. Lobo pleaded guilty was that it was limited to Mr. Lobo and the police officials seen in the video. (May 16, Plea Tr. 20:18-21:4).  In addition, at no point during that videotaped meeting does Mr. Lobo utter a word.  To assert that a video in which Mr. Lobo remains completely silent and never provides anything to anyone is evidentiary support for a bribery enhancement is without merit.

Moreover, the government's contentions that Mr. Lobo had bribed (1) the "chief" of the Honduran National Police in the Cortes Department; (2) Captain Mendoza, Carias and the military personnel in the SUVS; as well as (3) Colonel Amaya and others are merely conjecture and wholly unsupported by *any* evidence.

---

[31] *Id.* at 50-51.

[32] *Id.* at 51.

(May 16, Plea Tr. 20:18-21:4).  Clearly, the government may not meet its burden by offering conjecture alone.

Finally, the government's assertion that a two-level enhancement is appropriate based upon the bribes Rivera Maradiaga may have paid to law enforcement personnel is unpersuasive and unsupported by the evidence.  Rivera Maradiaga never testified that he paid any bribes to any law enforcement officials.  While Mr. Lobo asserts that Rivera Maradiaga is unworthy of belief, the four corners of the transcript reflect he merely claimed to have bribed Honduran politicians.  The government's attempt to augment Rivera Maradiaga's testimony to include statements he never made is improper.

For the reasons set forth above, a two-level bribery enhancement pursuant to §2D1.1(b)(11) is not applicable to Mr. Lobo.


### *Role Enhancement Pursuant to U.S.S.G. §3B1.1*

Pursuant to U.S.S.G. §3B1.1 (a-c), a court may increase a defendant's offense level by 2 to 4 levels based on an aggravating role in the offense.  The Guidelines offer guidance to a court evaluating the role of a defendant, stating in the section's commentary:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, *the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense*, the nature and scope of the illegal activity, *and the degree of control and authority exercised over others.*

USSG §3B1.1, comment, n.4 (emphasis added).

Section 3B1.1 "provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense." *Id.* § 3B1.1(a) cmt. background. *United States v. Kent*, 821 F.3d 362, 368–69 (2d Cir. 2016).

When "leadership" is considered, a primary factor is whether the defendant's role is considered extensive and the number of people involved. The Court of Appeals has ruled "an adjustment under Guidelines §3B1.1 may be based primarily on the number of people involved, ... rather than other possible indices of the extensiveness of the activity." *United States v. Kent*, 821 F.3d 362, 369 (2d Cir. 2016), citing *United States v. Carrozzella,* 105 F.3d 796, 802 (2d Cir. 1997), *abrogated in part on other grounds, United States v. Kennedy,* 233 F.3d 157, 160–61 (2d Cir.2000).

In determining the number of participants, a district court may consider: (1) *the number of knowing participants* in the criminal activity; (2) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (3) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme. *Carrozzella,* 105 F.3d at 803–04. Using these considerations, a district court can determine whether the scheme at issue was "otherwise extensive," that is, whether the scheme was "the *functional equivalent* of one involving five or more

knowing participants." *Carrozzella,* 105 F.3d at 803 (emphasis added); *see, e.g., Archer,* 671 F.3d at 166 (2d Cir.2011) (affirming the application of a § 3B1.1(a) enhancement because it was uncontested that there were at least three knowing participants and "a fair number" of unknowing participants, "the precise number being impossible to determine"). *United States v. Kent*, 821 F.3d 362, 369 (2d Cir. 2016).

In *Carrozzella, d*etermining whether the services of an unknowing participant are peculiar and necessary to the scheme requires an examination of "the nature of the services provided."  105 F.3d at 804.  Thus, while a perpetrator "anxious to close a fraudulent deal may occasionally have the crime in mind when hailing a cab to hurry to a meeting with victims," such "[l]awful services ... are not peculiarly tailored and necessary to a particular crime but are fungible with others generally available to the public."  *Id.  United States v. Kent*, 821 F.3d 362, 369 n.6 (2d Cir. 2016).

Section 3B1.1(b) sets forth enhanced penalties for defendants who act as managers or supervisors of group criminal activity.  A three-level enhancement is applicable "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b).  To qualify for the enhancement, a defendant need only have managed or supervised one participant.  *United States v. Burgos,* 324 F.3d 88, 92 (2d Cir.2003) (citing *United States v. Payne,* 63 F.3d 1200, 1212 (2d Cir.1995)). Although the Sentencing Guidelines do not define the terms "manager"

or "supervisor," the Second Circuit has held that "[a] defendant may properly be considered a manager or supervisor if he 'exercise[d] some degree of control over others involved in the commission of the offense ... or play[ed] a significant role in the decision to recruit or to supervise lower-level participants.' " *United States v. Blount,* 291 F.3d 201, 217 (2d Cir.2002) (quoting *Ellerby v. United States,* 187 F.3d 257, 259 (2d Cir.1998) (per curiam); *see also* U.S.S.G. § 3B1.1(b), cmt. n.4). *United States v. Birkin*, 366 F.3d 95, 101–02 (2d Cir. 2004).

The government rests their argument for a role enhancement on the fact that Mr. Lobo had a security detail. Aside from this there is no evidence that Mr. Lobo led, managed, supervised or otherwise had supervision of any other knowing participant. Mr. Lobo merely responded to the Cachiros; the Cachiros called, directed, and dismissed Lobo as they needed him. (Mar. 6, Tr. 42:16-24).

In addition, Mr. Lobo's role in this offense rests upon the actions of the grand jury as manifested in the indictment to which he pleaded guilty. [ECF 3]. His role is further defined by government counsel in response to questioning by this Court as to the factual predicate that would support Mr. Lobo's guilty plea at the time he accepted responsibility and pleaded guilty. Plea Hearing Transcript, May 16, 2016, Tr. 20:18-21:4. During the change of plea hearing, the Court inquired of government counsel about the underlying factual predicate, below is the government counsel response:

> MR. BOVE: Because, as I described, there were individuals involved in this purported transaction that were acting at the direction of law enforcement, *I want to be clear that the government's position*

> *regarding participants in the conspiracy, for purposes of this guilty plea, is that it included the defendant, as well as the police officials that I described.*

May 16, Tr. 20:23-21:4 (emphasis added).  An enhancement for an aggravating role in the offense, in light of the government evidence, is not warranted.

### Direct Importation Enhancement Pursuant to U.S.S.G. §2D1.1 (b)(15)(C)

A defendant faces a two level guideline enhancement if "directly involved" in the importation of a controlled substance.   U.S.S.G. §2D1.1 (b)(15)(C).   This guideline section is triggered if the defendant receives an adjustment under §3B1.1 for aggravated role in the offense.  To apply this guideline enhancement, the Court must conclude what action by Mr. Lobo constituted "direct involvement" in the importation of a controlled substance.

The following cases offer some guidance on what "direct involvement" means. In the case of *United States v. Munoz-Vargas*, 551 F. App'x 206, 208 (5th Cir. 2014)(unpublished decision), the facts of the case detailed how the defendant "directed individuals in the importation of marijuana from Mexico and, if successful, to his residence in Houston."  In the case of *United States v. Edmund*, 579 F. App'x 149, 150 (3d Cir. 2014)(unpublished decision), a defendant "recruited approximately nineteen couriers to travel to Panama and bring back large quantities of cocaine. Once the drugs entered the state, [the defendants] sold them at different locations

and later the operation expanded to include smuggling heroin from Afghanistan via Texas.

In the Southern District of New York, in the case of *United States v. Philippeaux*, No. 13 CR. 277 (RWS), 2016 WL 270868 (S.D.N.Y. Jan. 21, 2016), a defendant hatched a scheme to purchase cocaine abroad and import it for retail sale in New York. The defendant traveled to Panama and Colombia to arrange for the purchase of cocaine, then transferred money to be used for the purchase and transport of the cocaine to New York. All the cases cited reveal scenarios where defendants are highly involved in the trafficking and importation of the controlled substance. Terms such as "directing" or "recruiting" are commonly used to describe the defendant's activity. There is no evidence to support such knowledge on the part of Mr. Lobo.

The government cites as persuasive authority the case of *United States* v. *Suarez* and argues that §2D1.1 (b)(15)(C) is equally applicable drawing a comparison between the facts from the *Suarez* case to Mr. Lobo's case. 2014 WL 1998234 (S.D.N.Y. May 15, 2014), *aff'd* 615 F. App'x 5 and 791 F.3d 363 (2d Cir. 2015). However, *Suarez* cannot be more different. A review of the *Suarez* case, with focus on the government sentence memorandum in *Suarez* clearly shows how disparate such a comparison rings. Included below is the pertinent language of the introductory page of the sentence memorandum.[33] Mr. Lobo respectfully submits

---

[33] Taken from the government's sentencing memorandum:

that he did not stand "at the center" of any drug empire.  Rather, he was used as a tool to move a drug load and lend his name and face.

Each of the cases cited above involve defendants that are playing pivotal roles in the drug importation scheme.  The role of Mr. Lobo, even taken in the light most favorable to the government, falls far short of what courts across the nation have deemed as appropriate for an enhancement pursuant to §2D1.1 (b)(15)(C).

Turning to the government's own witness, Rivera Maradiaga's testimony does not support a defendant that was "directly involved in the importation of a controlled substance."  *Id.*  Rather, the testimony reveals that Rivera Maradiaga: (1) wanted Mr. Lobo around because he knew that if he were with the president's son, "everything would go well" (Mar. 6, Tr. 58:7-12); (2) that Rivera Maradiaga

---

Yesid Rios Suarez *devoted his life to producing and transporting drugs*, and directing violence against those people – including innocent civilians – who posed threats to his drug organization. In over *two decades of close coordination with members of the Fuerzas Armadas Revolucionarias de Colombia (the "FARC")*, the defendant, along with his nephew and codefendant, Didier Rios Galindo, assisted the FARC in gaining control over much of the global cocaine trade. *The defendant also worked closely with other drug traffickers to transport and to protect multi-hundred kilogram loads of cocaine being transported to various locations, including the United States.*

Put simply, to look back at the defendant's life is to look at a man devoted to using fear, intimidation, violence, and power to enrich himself and his drug organization. This defendant *allied himself with terrorists and drug traffickers*, caused the murder of innocents, and did harm to countless drug users and their loved ones – and he did so for one reason: profit. *This is the rare case where the Court has before it an individual who stood at the very center of the international drug trade for decades*, and who was responsible, along with his nephew and their allies in the FARC, for much of the cocaine that ended up in the streets of American cities.  Now is the time where the defendant must be called to account for his many transgressions – the tons of cocaine produced and sold, the terrorists aided in his own country, and the lives he caused others to take solely to protect his criminal organization.

*Suarez,* 1:11-cr-00836-KBF, Document 60, Filed 06/09/14, Page 2 of 21 (emphasis added).

would instruct Mr. Lobo to check into a hotel (Mar. 6, Tr. 60:4-11); (3) Mr. Lobo was told to wait in a hotel as Rivera Maradiaga and others received the drug shipment (Mar. 6, Tr. 61:10-12); (4) Rivera Maradiaga retrieved Mr. Lobo and used him as a distraction as a truckload of cocaine passed by a police checkpoint (Mar. 6 Tr. 63:2-65:17); (5) Rivera Maradiaga was armed, but Mr. Lobo did not have a weapon (Mar. 6 Tr. 64:3-4); (6) Mr. Lobo waited at a soup restaurant as Rivera Maradiaga and others delivered the drugs to a ranch (Mar. 6 Tr. 65:24-66:10; 67:1-6).

Rivera Maradiaga's testimony regarding both of the drug shipments for which he described using Mr. Lobo clearly establishes that Rivera Maradiaga directed Mr. Lobo's every move and kept him in the dark about the significant details.  He told Mr. Lobo where to meet, who to bring, and what to do.  He never discussed with Mr. Lobo, however, the identity of the owner of the cocaine "Los Cachiros" was transporting (Mar. 16, Tr. 34:12-22), to whom that cocaine would be sold or what would happen to it thereafter.  (Mar. 16, Tr 35:15-21).  According to Rivera Maradiaga, Mr. Lobo's only job was to provide security.  (Mar. 16, Tr. 38:16-40:10)  In his own words, Rivera Maradiaga succinctly described the duty of Fabio Lobo during one event as simply bringing the drugs from the airstrip to the highway.  (Mar. 16, Tr. 39:18-25, 40:1-10).

## CONCLUSION

For the reasons set forth, Mr. Lobo respectfully asks the Court to deny application of any of the enhancements discussed and order the U.S. Probation Office to modify the presentence report to appropriately reflect the Court's decisions.

Dated April 13, 2017

Respectfully submitted,

RETURETA & WASSEM, P.L.L.C.

By:_____
Manuel J. Retureta, Esq.
300 New Jersey Ave., NW, Suite 900
Washington, D.C.  20001
202.450.6119
MJR@RETURETAWASSEM.COM
*Defense Counsel for Fabio Lobo*

cc:  All parties via ECF filing.