UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA


-against-                                                   15 Cr. 174 (LGS)


CARLOS ZAVALA VELASQUEZ
-----------------------------------------------------------X


### DEFENDANT CARLOS JOSE ZAVALA VELASQUEZ
### SENTENCING SUBMISSION


Howard Leader
Attorney for Defendant
11 Park Place, Suite 1715
New York, New York 10007
Tel. (646) 533-7696

# INTRODUCTION

Carlos Zavala Velasquez is scheduled to be sentenced by this Court on May 22, 2018. He is now almost 48 years old and this matter represents the one and only occasion when he has been involved in the criminal justice system as a defendant, here in the United States or anywhere else. He pleaded guilty in May 2017 after voluntarily self-surrendering in July 2016 in Tegucigalpa, Honduras.

Mr. Zavala pleaded pursuant to an agreement with the government. As the Court will see, he is facing a considerable amount of time under the Unites States Sentencing Guidelines (USSG or Guidelines, as the case may be). Yet, for the reasons which follow, this first-time offender who is a highly decorated veteran police officer, who has been wounded twice in the line of duty and who has been targeted for assassination, should be sentenced to time-served. As the Court will see, such a sentence would be consistent with the ends of justice and is certainly in accordance with the Court's statutory mandate to sentence the accused to a term that is "sufficient but not greater than necessary." *See,* 18 U.S.C. 3553(a).

1

## PERSONAL HISTORY & BACKGROUND

By all accounts, Mr. Zavala was born into a warm, loving family in the city of Catacamas, which is located in the department of Olancho, Honduras.

His childhood was largely happy. From a material perspective, the family was not wealthy but they were comfortable and seemed to lack for none of the necessities. Mr. Zavala was the eldest of four children. His mother has always worked in the school system and is an elementary school administrator. His father was a police officer with the Honduran National Police (HNP), who died at age 62 from a heart attack.

Clearly, the importance of public service and, indeed, duty were passed on to the children by the parents. Mr. Zavala himself became a police officer with the HNP in 1991. His brother Jose is himself also a police officer. His sister has followed their mother into a career in education and is a teacher in Sonaguera, Honduras.  Mr. Zavala's other brother, Fredy, lives in Harris, North Carolina and is a farmer.

Following four years of mandatory police college, Mr. Zavala embarked on a remarkable professional career. Highlights have included the following assignments:

- 1995-1997: assigned to work with Interpol to counter international narcotics trafficking, kidnapping and violent carjacking crimes; worked in collaboration with the Federal Bureau of Investigation; wounded in 1995 in the line of duty during an attempt to arrest car-thieves; participated in the arrest of numerous gang leaders operating throughout Central

America, Mexico and the U.S. in organized crime activities such as human trafficking, drug trafficking and car-theft rings; awarded commendation in El Salvador, Interpol;

- 1997-2000: assigned to the HNP COBRA unit; this is a kind of commando-style SWAT team to counter organized crime, and its involvement in kidnaping in particular; worked alongside U.S. Army who were present to provide logistical support during period of ongoing political and social upheaval, such as helicopters particularly in rural areas; awarded commendation for efforts related to Operation "Cielo Central"; also worked alongside Israeli Special Forces;

- 2000-2001: assigned as Chief of Police to the municipality of Tela, a town of approximately 200,000 inhabitants; promotion to this post is notable for the fact that Mr. Zavala was only 29 years old and Tela had relatively sizeable population; he was responsible for every aspect of safety and security for the entire municipality; it was also during this time that Mr. Zavala met and married his wife, Roxana;

- 2002-2005: assigned as HNP intelligence officer, responsible for nationwide analysis and developing strategies to combat organized crime and kidnaping gangs; leading to the disruption, arrest or killing of many gang-members and the rescue of some 150 kidnap victims;

- 2005-2007: assigned as second-in-command to the Chief of Police for City of San Pedro Sula, which, at the time, had a population of approximately 700,000 people; in addition to being responsible for

3

assisting the town's Chief of Police in every aspect of policing, Mr. Zavala also had direct responsibility for directing efforts against kidnappings and all criminal investigations while still only 34 years old on commencing this assignment; wounded for the second time in the line of duty in an ambush that left one colleague a paraplegic;

- 2007-2008: Mr. Zavala sought sanctuary in the United States on the advice of his superiors following assassination of his second-in-command/assistant;

- 2008-2010: upon his return to Honduras, Mr. Zavala was re-assigned to the COBRAs again, this time as head of the unit for all of San Pedro Sula; with the 2009 *coup d'etat* again leading to civil turmoil and unrest, Mr. Zavala was tasked to riot-control duties and anti-kidnapping units in coordination with Colombian anti-kidnapping and extortion unit known as GAULA; wounded in line of duty for second time;

- 2011-2012: assigned as Chief of Mobile Police Battalion, San Pedro Sula; this was a special unit dedicated to logistical support to other HNP units, such as the Riot Police during a time of continued political upheaval in Honduras;

- 2013: assigned as Chief of Regional Special Services, responsible for investigations to disrupt, arrest and prosecute members of organized crime, including gangs responsible for kidnappings, human-trafficking, prostitution, car-theft rings and economic crimes such as tax evasion, counterfeit goods and identity theft; directed and participated in drug and

4

weapons seizures; also assigned to be in charge again of anti-kidnapping unit, coordinating with Colombia's GAULA and US Embassy re efforts against human trafficking and counter-narcotics; spearheaded investigation into Hector Emilio Fernandez Rosa , a/k/a "Don H", leading to, *inter alia*, seizure of massive weapons cache; led investigation into disappearance and murder of journalist Anibal Barrow;

- 2014: attended mandatory HNP Police Academy training, Tegucigalpa[1]; while there, assigned in July 2014 as Deputy Chief, Department of Comayagua, which has some 14 different municipalities, to combat substantial organized crime activities;

- 2015: assigned as Chief of Police for City of Villanueva, Department of Cortes; fully responsible for every aspect of safety for some 150,000 residents; directed operations to counter street-level narcotics dealing and the Highway Patrol;

- 2016: participation in joint task-force "Operation Xatruch" with the Honduran Army's Special Forces, based in the city of Tocoa, Department of Colon, to address violence stemming from agrarian disputes that had led to violence, including many deaths and disappearances often at hands of HNP and Honduran Army; area then comparable to rural domination areas controlled by FARC in Colombia for decades, including illegal activities such as large-scale drug manufacturing and trafficking; directed and participated in discovery of hidden landing-strips and

---

[1] The crucial meeting attended by Mr. Zavala, at which providing logistical support for a large load of narcotics was discussed and which was recorded, took

5

eradication of narcotics trafficking, including the discovery of the first and only fully-equipped and fully-operational cocaine laboratory in Honduras;

- June 2016: removal from HNP once underlying Indictment charging "Lobo Conspiracy" was unsealed in the Southern District of New York.

For much of his work, Mr. Zavala was rewarded with promotions, commendations, citations and awards. He took great pride in continuing the legacy handed down to him by his father. Mr. Zavala also had a fierce sense of love for his country, and was determined to do whatever he could to combat those forces he saw as responsible for much of the crime that has plagued Honduras during times of great upheaval, both in the cities and in the countryside.

From a personal perspective, meeting his wife Roxana has been as integral to Mr. Zavala's life as his professional career. As noted above, he met her in 2000 following his assignment as Chief of Police for the municipality of Tela. She was already a successful business-woman in her own right, owning a hardware store. Her parents had done quite well from their farming business and had been able to buy Roxana her own house.

Although Mr. Zavala was already a father, having had a son with another woman with whom he had had a brief relationship, he was now ready to settle down and start what he regarded as a real family of his own.

Together, they have had two children, Anthony, who is now 13, and Astrid, who is 9. Attached collectively as Exhibit A for the Court's consideration are letters from each of Roxana and the two children. The letter from Roxana is

particularly illuminating, for numerous reasons. Mr. Zavala is described as a devoted, loving and attentive father and husband. In particular, part of her letter describes a family life that sounds idyllic. Both parents, content in their work. Weekends spent together as a family, Mr. Zavala cooking breakfast, going to Church on Sundays and him happy to be grilling for friends.

As explained in great detail below, it would be no exaggeration to state that this picture of happiness and apparent tranquility have been utterly ripped apart by a combination of, the events that have brought Mr. Zavala to this point in his life together with a number of well-documented health-related issues.

As a consequence of being charged here in the United States, the Zavala family has had their world turned upside down. They have lost the family home. It mattered not to the Honduran authorities that her parents had gifted the house to Roxana years before she had ever even met Mr. Zavala. She describes being hauled out of the house by soldiers at gunpoint as she and the children were forced to watch as their home was trashed. What was not broken inside the house was seized.  Her business is also under threat of seizure even though, again, she owned and operated it for years before meeting her husband. They are now forced to live off of the kindness and limited generosity of her parents. Roxana has had to incur significant debts to keep their heads above water.

Mr. Zavala voluntarily self-surrendered to the DEA in Honduras to face the charges here. Almost immediately, and as the Court may remember, Roxana and the children had their visas to travel to the United States revoked by the State Department. As the Court knows, Mr. Zavala is one of a number of codefendants

7

in this matter. Yet, it is counsel's understanding that none of the families of the other defendants have had to endure such treatment, whether at the hands of the Honduran government or the United States.

Moreover, Mr. Zavala's case has received much media attention in Honduras. It is believed that this not so much because he is a person otherwise worthy of press attention. Rather, it is because he is a codefendant of the real target here, Fabio Porfirio Lobo Lobo, the son of the ex-President of Honduras, "Pepe" Lobo. The Court will recall that it sentenced Fabio Lobo to 24 years in September 2017. Accordingly, the Honduran press has engaged in a veritable feeding frenzy in reporting on Mr. Zavala and the other defendants charged here. To say that much of the reporting on Mr. Zavala has been flawed or misinformed would be a polite understatement. However, it has had one noteworthy consequence: as also noted in her letter to the Court, Anthony and Astrid have had to endure bullying at school. It appears that these young children no longer have their home and are not safe in what is supposed to be a secure environment for learning either.

Not content with all this, the Honduran government has seen fit to also exact punishment on Mr. Zavala's youngest brother. He has been suspended fro his post with the HNP since shorty after Mr. Zavala surrendered. There was never any suspicion regarding the younger Mr. Zavala so far as counsel is aware. It is highly unlikely an investigation to clear him could last so long. Yet, he remains unable to perform his duties as a police officer. There is a very clear sense that

this too has been done to exact further punishment on Mr. Zavala by the Honduran government.

As explained in great detail in the report of Dr. Stephen Price dated May 14, 2018 and attached herewith as Exhibit B ("Price Report"), the impact of all these factors has been profound on Mr. Zavala.

Specifically, Mr. Zavala has described his feelings guilt and responsibility for all that his befallen his family as a result of his arrest. Also, he has spoken of his sense impotence in the face of all this, which is all the more poignant due to his keen awareness of his perceived fundamental failure to protect his family. Mr. Zavala is also deeply affected by his inability to do anything to assist them as he is incarcerated here in New York.

This impotence is aggravated by the enforced separation from his family that Mr. Zavala must continue to endure due to his wife and children's inability to travel to the United States for the reasons noted above.

## THE DEFENDANT'S PSYCHOLOGICAL ISSUES

Mr. Zavala was examined by Dr. Price on May 1, 2018 over a two-hour period at the MCC, NY. Dr. Price's *curriculum vitae* is attached hereto as Exhibit C. His credentials will not be repeated here, but it is quite clear that he is a highly qualified psychiatrist, with particular and extensive experience in the field of Post Traumatic Stress Syndrome ("PTSD").

In his report, Dr. Price is quite clear that Mr. Zavala has been suffering from PTSD for many years. Indeed, Dr. Price states that not only was Mr. Zavala correctly diagnosed as suffering from this condition in Honduras in 2010 (twice), but also that he had been suffering with PTSD for many years prior. This had gone undiagnosed and untreated. Even after being diagnosed in Honduras, significantly, Mr. Zavala received no therapy. Further, this condition persists to this day. *See* Price Report, p. 7.

The two, separate 2010 diagnoses in Honduras were conducted by Dr. Pedronel Gonzalez Rodriguez and Dr. Americo Reyes. Copies of these diagnoses are attached hereto collectively as Exhibit D.

Moreover, and at least as serious, was the diagnosis of other specified schizophrenia and other psychotic disorder, specifying a mental disorder and behavior, which Dr. Price notes was caused by alcohol use.

Indeed, it is clear that Mr. Zavala had been using alcohol to self-medicate for a number of years in an effort to manage his PTSD on his own. Dr. Price states that this is quite common among many men in the military and the police. *See,* Price Report, pp. 7-8.

10

Both doctors in Honduras noted in their reports that Mr. Zavala was experiencing marital difficulties.

All these issues were discussed with Dr. Price in considerable detail on May 1, 2018.

The descriptions of his experiences as a police officer for more than 20 years in Honduras Mr. Zavala provided to Dr. Price, together with their impact on him and his relationships, were often graphic and harrowing.

The evaluation and analysis by Dr. Price of these episodes, and their consequences, is most insightful.

Mr. Zavala described the arc of his career to Dr. Price. Honduras was, and remains, a violent country with a high incidence of crime. Over the course of more than two decades, Mr. Zavala's assignments frequently included postings leading to paramilitary-type engagements with an enemy who were his own countrymen, but who were also often violent criminals. Typically, they would prefer to shoot rather than be taken alive. Mr. Zavala would often witness first-hand both violent and bloody attacks. At times, he would see, two to three times a week, violent confrontations that resulted in people being severely wounded, including innocent civilians, colleagues and friends, as well as the criminals he was seeking to capture. On occasion, Mr. Zavala was directly targeted for assassination. Colleagues, men with whom he had worked with closely for years, were killed or wounded. Mr. Zavala himself was wounded twice.

In many ways, Mr. Zavala would be operating in warzone-like conditions for weeks at a time before returning to the supposed tranquility of his wife and

11

family. Once there, he was required to hide everything he had witnessed to assume the role of the loving and nurturing husband and father once more. On returning to duty, Mr. Zavala would have to "flip" the proverbial "switch" to become a warrior again.

The toll that this has taken on Mr. Zavala is quite clear and has had a direct effect on his actions that have led him to be before this Court at this time.

Dr. Price describes how many of these factors caused Mr. Zavala to commit the criminal conduct in which he was engaged at the time of the offense to which he has pleaded guilty.

> "Mr. Zavala attempted to manage his symptoms of PTSD as best he could on his own, hid the worst of his problems as best he could to avoid negative consequences at work and self-medicated by using alcohol to control his stress." Price Report, p. 8.

Dr. Price goes on to note that, "[Mr. Zavala] drove himself to increase his work in order to prove to himself and his superiors that he was master of any problems." *Id.*

Regarding the first time Mr. Zavala was wounded in the line of duty in 1995, he was still only 24 years old. This, apparently, was an ambush. The second occasion was in 2009. As the Presentence Report dated March 5, 2018 ("PSR") notes, he was grazed in the neck by a bullet. *Id.,* ¶46. The scar is still plainly visible on the left side. The bullet appears to have missed the jugular by less than an inch. Mr. Zavala has explained that this episode was a veritable bloodbath. This too was an ambush. He believes he was able to emerge alive only because the AK-47 rifle belonging to one of the gang-members they were

trying to fend off jammed just as he was pointing it at Mr. Zavala and trying to fire. A colleague was not so fortunate. After taking a bullet to the head, he became a paraplegic.

Another episode, however, that seems to have pushed Mr. Zavala over the edge was the 2007 assassination of his second-in-command and assistant in what was yet another ambush. As he describes it, Mr. Zavala was due to be driven by this colleague to a meeting. Immediately prior to their scheduled departure, the colleague went for gas to a nearby gas station to save them time. Wrongly believing that Mr. Zavala was then also in the vehicle, assassins waiting nearby riddled the car with bullets, killing Mr. Zavala's assistant and leaving him with 38 bullet wounds.

Mr. Zavala and his family had received numerous death threats from organized crime gang leaders, who Mr. Zavala had been hunting for their role in violent car-jackings and drug-dealing. Clearly, Mr. Zavala had been their target, and it was his trusted and close colleague they had killed. Accordingly, on the advice of his superiors, Mr. Zavala sought sanctuary in the United States with his family for almost a year. He only returned when he was informed that the perpetrators of his colleague's murder had themselves been killed in a shoot-out with rivals.

Yet another incident was also described by Mr. Zavala to Dr. Price. During an operation in 2004 to rescue of kidnap-victims when attached again to the SWAT-like COBRAs, another officer was shot in the head, splattering blood and

13

brain-matter over Mr. Zavala. Price Report, p.5. The stench blood has stayed with him so that it continues to bother Mr. Zavala to this day.

During the interview and evaluation by Dr. Price on May 1, 2018, Mr. Zavala described in detail a number of the symptoms from which he has been suffering as a result of these numerous work-related traumas over many years.

For example, Mr. Zavala described how his sleep patterns have been profoundly affected. First, he could not get to sleep without a light on in the room because he feared intruders coming to attack him during the night. He has seen shadows that he has also mistaken for intruders. This same fear of intruders has led to his insistence that at least one colleague share the sleeping quarters when away from home on a tour of duty for weeks at a time.

Nightmares so vivid that they have awoken Mr. Zavala, covered in sweat and unable to get back to sleep. He reports that on two occasions, he recalls dreaming he was being attacked by unknown assailants. He recalls trying to fight them off, and his wife, Roxana, had to wake him because he was hitting her in the mistaken belief that his sleeping wife was the assailant.

Further, when he started to sleep with his service weapon on the bedside table, Roxana would wait for him to fall asleep so she could remove for the sake of both their safety.

The heavy drinking to self-medicate, and all these factors described here have combined to place enormous strain on the marriage. The enforced separation due to Mr. Zavala's incarceration here has, understandably, placed still further strain on their relationship.

14

Another aspect that Dr. Price notes in his report is how the fact of his incarceration with those very same individuals he had spent a lifetime bringing to justice are now in the very same jail where he must await the Court's decision. His time spent incarcerated here has been particularly harrowing because of his understandable fears of violence against his person, particularly from individuals seeking to exact retribution as they had previously been targets of his investigations in Honduras. Mr. Zavala has participated in the seizure of drugs, weapons and property belonging to individuals now facing charges here in the United States.

Not surprisingly, Mr. Zavala reports that he has indeed received threats on a number of occasions from several individuals.

An important consideration for the Court is that Mr. Zavala's conduct during the time he was operational in Honduras occurred in the context of a police culture that can be accurately summed up as "the ends justify the means."

Crime and corruption were so rife, combatting violent and deadly gangs in the towns, municipalities and rural areas was extremely difficult with the resources available and there were larger, political concerns at play. In order to address the wave of organized gang crime-wave that sprung up in the vacuum created by a perceived lack of respect for the rule of law, the HNP was directed to take a tough stance to protect its citizens.

This was the backdrop to the culture at the HNP. Provided police officers did not get caught so as to embarrass their superiors, Mr. Zavala relates that it

15

was understood police officers were at liberty to function as they thought fit to accomplish HNP goals.  Crucially, Dr. Price takes pains to explain the following:

> "In the context of this culture, Mr. Zavala had apperception of himself as a key figure in bringing down the criminals in his society and saw himself as having permission to act against hem as he saw fit. *His mental condition eroded his ability to control himself and, rendered out of control, led to the disastrous results in the circumstances of this case.*" *See* Price Report, pp. 8-9 (Emphasis added).

Thus, at the core of Mr. Zavala's actions at the times relevant for the Court to consider was the fact that he was suffering from several serious mental conditions, including PTSD, which had been previously diagnosed and had existed for years prior thereto. These mental conditions had the effect of skewing the decisions Mr. Zavala made while he exercised the freedom or license he thought he had to act as he saw fit in committing questionable and/or illegal acts.

Thus, to be clear, Mr. Zavala's acts at times were not the product of his inability to distinguish right from wrong, or the legal from the illegal. Rather, they stemmed from his mistaken desire to serve what he thought was a greater good. It mattered not whether what he did was legal or illegal at times. What mattered, and what motivated Mr. Zavala, was the results obtained to combat crime through his actions.

However, it should also be noted that the HNP culture of *machismo* was also dominant. Accordingly, Mr. Zavala feared addressing his mental health issues directly by way of seeking treatment. He knew that, if he had, his career would be effectively over. Consequently, although the diagnosis of PTSD was routinely included in his police examinations, this was only in terms of "fitness for duty" rather than an open and honest evaluation requiring therapy. The

prescribed treatment was limited to prescribing sleep medication to address his insomnia.

Finally, it bears stating that Dr. Price makes clear his diagnosis of PTSD as still being present, and that the prognosis for Mr. Zavala should his incarceration be continued and/or prolonged. He states, " … continued and/or prolonged incarceration would likely lead to further erosion of his mental erosion." Price Report, p. 10.

## MR. ZAVALA'S COLOR OF AUTHORITY DEFENSE AND SELF-SURRENDER TO AUTHORITIES IN HONDURAS

Once the charges in the underlying Indictment were unsealed here in the United States in June 2016, Mr. Zavala began to make arrangements through his superior, Commissioner Orlin Javier Cerrato Cruz, to voluntarily self-surrender to US authorities rather thank fight his extradition.

Mr. Zavala was strongly motivated by a desire to clear up what was, to him and his superior officer, obviously a misunderstanding. Unfortunately for Mr. Zavala, the situation was far more complex than either understood at the time.

Since then, it has become apparent that, two years earlier, in June 2014, there were two separate but overlapping investigations being conducted simultaneously in Honduras that are of consequence here – one, a full-blown operation being conducted "in-country" by the United States Drug Enforcement ("DEA"), and a second, still-nascent and preliminary fact-gathering investigation by Mr. Zavala for the HNP.

Critically, neither knew of the existence of the other and had different targets.

The DEA investigation was fairly extensive and multi-national, targeting the intersection of major international narcotics trafficking in Central and Southern America, and the cash generated by such activity, and the corruption of highly placed officials in these countries who helped to facilitate the activity.

To assist in the capturing and landing these large fish, the DEA would, among other assets, use the services of major narcotics traffickers, who were now cooperating with the government, to attract the corrupt politicians and/or

18

their close relatives who either might have been used as "cut-outs", or who were themselves seeking to take advantage of the high positions of close family members. An example of the latter would be the use of a father and son team of Mexican drug-dealers to ensnare the nephews of the First Lady of Venezuela in 2015. The nephews, Efrain Campo Flores and Franqui Flores De Freitas, were arrested, indicted, and eventually tried and convicted before Hon. Paul A Crotty at the end of 2017. (*See generally*, *United States v. Flores and De Freitas,* 15 Cr. 765 (PAC).

The charges in the original Indictment before this Court involved the participation of the same two Mexican drug-dealers, who with other Honduran cooperators, were seeking to lure the son of the ex-president of Honduras (Fabio Porfirio Lobo Lobo) to also agree to participate in the shipment in a load of cocaine across the country, that was ultimately destined for the United States. This may be labeled "The Lobo Conspiracy."

By happenstance, Mr. Zavala was, at the time assigned to attend his quadrennial police training courses at the HNP Police College in Tegucigalpa. Other officers also in attendance there had been approached by still other officers with connections to a family of large-scale Honduran drug-traffickers. The Honduran drug-traffickers were seeking to recruit corrupt police officers willing to provide logistical support to a pair of Mexicans supposedly seeking to transport a large quantity of drugs across the country. A meeting would take place, of which details would be provided.

19

It would turn out that the large-scale Honduran traffickers were known as the "Cachiros", who were already cooperating with the US government. The Mexicans would turn out to be the same father and son team who would later successfully ensnare the nephews of the Venezuelan First Lady.

As the Court will no doubt recall, one of the "Cachiros", Devis Leonel Maradiaga Rivera, would testify at the Lobo *Fatico* hearing it conducted, also in 2017.

It is counsel's understanding that Maradiaga made clear to a corrupt police officer that he wanted to recruit trusted individuals, HNP members with whom they had worked previously. Further, Maradiaga specifically tasked this officer to recruit "Zavala".

Carlos Jose Zavala Velasquez, the defendant now awaiting sentence before this Court, had never before worked with or on behalf of Maradiaga. A different officer named Zavala had, however and he had been a partner of this same corrupt officer. Accordingly, it is quite possible that Mr. Zavala had been recruited by mistake.

This possibility becomes more likely when another aspect is taken into account. Apparently, another officer who had worked with the Cachiros previously over an extensive period of time, visibly blanched when he saw Mr. Zavala arrive for the meeting with the Mexicans. Mr. Zavala was known as a loyal, incorruptible officer with a reputation for being the proverbial "company man".

20

Moreover, Mr. Zavala participated in the confiscation of various properties held in the names of third parties that in reality belonged to the Cachiros, as well as the seizure of drugs, guns and cars believed to belong to them. This was not the kind of activity that would be performed by someone who was a loyal and trusted officer whom had previously worked with the Cachiros.

On learning the information, Mr. Zavala immediately first sought guidance from Deputy Commisioner Rigoberto Oseguera Mass, who was also at the HNP College. In turn, Deputy Commisioner Oseguera Mass contacted their superior officer, Commissioner Javier Orlin Cerrato Cruz to meet at his office the following day.

As confirmed and corroborated by Commissioner Cerrato Cruz's Affidavit dated July 15, 2017, attached in the original Spanish together with a translation together hereto as Exhibit E, he authorized Mr. Zavala to attend the meeting "in order to further investigate and find out the details of the proposed drug shipment." *Id.*, ¶ 9.

Commissioner Cerrato Cruz goes on to state as follows:

> "Zavala made us aware of his intention to participate in the meeting with other National Police Officers and alleged [Mexican[2]] drug traffickers in order to collect information on this possible transit of drugs and as an intelligence agency we agreed that it was very important to know about this type of actions. And we agreed with Zavala to use it as a source of information." *Id.*, ¶ 12.

---

[2] Earlier in his Affidavit, Commissioner Cerrato Cruz details his specific recollection of the circumstances under which Mr. Zavala had been approached by other HNP officers to attend a meeting to discuss their lending support to Mexican drug-traffickers seeking to ship narcotics across Honduras to a destination that was still unknown. *See*, Cerrato Cruz Aff., ¶ 5.

From this, two things are clear. First, that Mr. Zavala had a viable "color of authority" defense to the matters charged in the underlying Lobo Indictment, stemming from his presumptively illicit attendance and participation at the video-recorded meeting in Tegucigalpa, also attended by Lobo.

Second, that Mr. Zavala and Commissioner Cerrato Cruz were targeting a pair of Mexican drug-dealers for investigation and possible prosecution.

Moreover, it was not necessary for Mr. Zavala to be officially deputized as an undercover officer or that there be formal authorization from the Honduran National Prosecutor's Office.

> "Because there was not yet a specific plan for sending narcotics our protocols will not require that he be formally sworn in as a covert officer or that we communicate with the prosecutors at that time. That had happened only when and if a plan was actually formalized and one had the possibility to confiscate the proceeds of crime and the participants because in Honduras there is no law that sanctions the conspiracy to traffic, distribute or send drugs." *See*, Cerrato Cruz Aff., ¶ 10.

Accordingly, Mr. Zavala attended the meeting in full uniform as instructed by the other officers who had recruited him, and he played the role of a corrupt HNP officer in order to gather detailed intelligence so that he and Commissioner Cerrato Cruz could then plan their next move, as duly authorized and directed by the Commissioner.

However, Mr. Zavala was unable to take any further official action after attending the meeting in Tegucigalpa. Nothing had been formalized by way of an actual plan of action at that time. Indeed, nothing further was heard regarding the Mexicans and the possible trans-shipment of narcotics so far as Mr. Zavala was concerned.

Further, it was only two years later, after news of the unsealing of the underlying Indictment charging the Lobo Conspiracy came to light, together with the surrounding facts, that Mr. Zavala became aware that the son of the ex-President of Honduras had also attended the meeting in 2014.

Accordingly, in July 2016, Mr. Zavala voluntarily self-surrendered to agents of the DEA and agreed to be flown to the United States to face the Lobo Conspiracy charges as contained in the underlying Indictment here in the Southern District of New York.

From his perspective, Mr. Zavala had nothing to hide. He thought he would be able easily to clear up what was, clearly, a misunderstanding among law enforcement colleagues and cooperating agencies, albeit from different countries.

In that same spirit, a few days before surrendering, Mr. Zavala also met with DEA agents and agreed to talk with them. The underlying Indictment had been unsealed and Mr. Zavala had been charged in a conspiracy with other HNP officers to assist in the importation of narcotics into the United States—the Lobo Conspiracy. The agents were, apparently, wedded to the notion that Mr. Zavala was nothing other than a corrupt police officer, who had not been acting in, essentially, an undercover capacity.

Nonetheless, they allowed him to leave the meeting and did not arrest Mr. Zavala, and he returned a few days later to be flown to the United States.

The Court should take into consideration under 18 USC 3553(a) Mr. Zavala's actions in agreeing to waive extradition and voluntarily self-

surrendering, Mr. Zavala should also be accorded full Acceptance of Responsibility by the Court in addition to his guilty plea. In addition to not requiring the government to prove to a Honduran court of competent jurisdiction that extradition was appropriate, he was fully compliant with the agents.

Moreover, by pursuing this path, Mr. Zavala wound up also forfeiting certain valuable rights. Specifically, as the Court will know full well, the government could not have indicted Mr. Zavala for any charges other than those contained in the underlying Indictment had he insisted on being extradited to the United States pursuant to a lawful order from a Honduran court.

Accordingly, in such a scenario, the government would have been limited to offering such proof at trial for the Lobo Conspiracy in the context of Fed. R. Crim. Proc. Rule 404(b). Given that this other drug-importation conspiracy involved none of the same participants other than Mr. Zavala, the government's likelihood of success in being permitted introduce evidence of this at trial must be characterized questionable. Thus, it is arguable that, had Mr. Zavala insisted on being extradited to the United States and on going to trial on the Lobo Conspiracy Indictment, his chances of success would have been significantly improved

Consequently, it appears that Mr. Zavala's voluntary self-surrender in Honduras may have also had the unintended consequence of handing the government a significant, tactical advantage, had he elected to go trial with his color of authority defense.

24

## MR. ZAVALA'S GUILTY PLEA

The agreement with the government pursuant to which Mr. Zavala pleaded guilty encompasses an altogether separate conspiracy from that with which he was originally charged. However, during his plea, Mr. Zavala essentially acknowledged performing the same kind of logistical support he was erroneously believed willing to provide in the Lobo Conspiracy to another cooperating Honduran drug-trafficker named Hector Fernandez Rosa, a/k/a "Don H". This conspiracy can be termed "the Fernandez Rosa Conspiracy".

A significant aspect of the plea agreement is that, at sentencing, the government will dismiss the underlying Indictment – in other words, the Lobo Conspiracy charges.

It has been counsel's understanding that the government has been willing to do so because it accepts that Mr. Zavala does indeed appear to have a viable claim of color of authority defense. Moreover, in further recognition of this claim, the government has agreed to allow Mr. Zavala to plead to a statute that has no mandatory minimum.

This is yet another factor which we contend favorably sets Mr. Zavala far apart from others in this case.

25

## MR. ZAVALA'S ACTIONS DURING THE YEARS CHARGED IN THE SUPERSEDING INFORMATION

Clearly, Mr. Zavala's actions during this time must be read in the context of the evaluation and opinion formulated by Dr. Price. Accordingly, while Mr. Zavala had already been diagnosed as suffering from the effects of PTSD in 2010, as well as the other psychiatric conditions noted earlier, these were all present for some years prior.

Also, Mr. Zavala's psychiatric condition and the mental-health issues he was facing appear to have facilitated his actions as being justifiable as the "ends justifying the means" aspect of the HNP culture that was prevalent.

Consequently, it is crucial that the Court understand that Mr. Zavala was not motivated by money or financial greed in doing what he thought was necessary in the fight against crime in Honduras. Rather, his actions were intended to help eradicate crime, even if he knew they were misguided and that they lapsed, on occasion, into the illegal.

Mr. Zavala has expressed profound regret and remorse for his actions, as he has come to see how misguided they were.

## MR. ZAVALA'S CONTINUED WORK AT THE HNP UNTIL THE UNSEALING OF THE LOBO CONSPIRACY CHARGES

Not surprisingly, Mr. Zavala continued to produce excellent results in even after his illicit involvement with Fernandez Rosa. Indeed, one of the accomplishments of which he is the most proud is the discovery of a massive weapons cache belonging to Fernandez Rosa.

The self-styled "Don H" had, among a veritable arsenal, including some 32 pistols of various caliber, 15 rifles, almost 5,000 rounds of ammunition, bullet-proof vests, military equipment, grenades, grenade launchers and night-vision goggles. Also recovered was a gold-plated, AK-47 with diamonds and pearls, thought to belong to Fernandez Rosa himself. This discovery made was widely reported in the news in Honduras. In pictures of the scene, Mr. Zavala can clearly be seen. A copy of one of the newspaper reports together with his official report dated January 5, 2013 and a translation, are annexed collectively as Exhibit F. Counsel is in possession of numerous other reports detailing the confiscation of real estate and various properties being held by "straw men" on behalf of Fernandez Rosa, and can be made available.

Another case in which Mr. Zavala participated was the investigation into the abduction and murder of the journalist, Anibal Barrow in July 2013. His Mr. Zavala succeeded in discovering the decapitated, burned and dismembered corpses of both Barrow and his driver. Rumors were rife that Barrow had been murdered on the orders of highly placed corrupt politicians. Mr. Zavala correctly identified the Cachiros. However, he was reassigned and was therefore unable to

27

follow up. As the Court may recall, the murder of Anibal Barrow was one of the approximately 87 murders that Maradiaga admitted to during the Lobo *Fatico*. Mr. Zavala's police report and a translation are annexed as Exhibit G.

Similarly, another operation of which Mr. Zavala is equally proud is his discovery in April 2016, only one month or so before his suspension from the HNP, of the only fully equipped and functioning cocaine-producing laboratory in Honduras. A copy of the official HNP report dated April 16, 2016 and a translation is annexed as Exhibit H. This seizure widely also reported. However, coming when it did, the timing was such that Mr. Zavala never received credit for this particular operation.

But for the unsealing of the charges against him in the Lobo Conspiracy, charges which we contend were ill-founded, Mr. Zavala's might well have continued until he was ready for retirement. The one potential pitfall, however, may still have been his mental-health issues, which went unaddressed.

## CONDITIONS OF CONFINEMENT

Since his voluntary self-surrender in July 2016, Mr. Zavala has had to endure the harsh conditions of confinement at both MCC, NY and MDC, Brooklyn.

Both facilities are designated as administrative detention centers by BOP. Consequently, the conditions of confinement there are harsher than at the typical prison facility where sentence prisoners would typically be designated.

Mr. Zavala is housed with numerous violent individuals. Because both facilities are located in urban settings, access to the open-air, recreation and the like are very limited. These conditions can often lead to inmates getting into fights and the entire unit gets punished, seemingly at random.

An instance of this occurred only this past weekend on Mr. Zavala's unit at MCC, NY. All the inmates were locked in their cells for 48 hours and not given water. The only food they were given consisted of two bologna sandwiches, which were frozen. Communication with the outside world was suspended, including to families or attorneys. All recreation, such as it is, has been suspended for 14 days. The showers have been denied to all inmates on the unit for 5 days.

Appropriate food and diet is always an issue in almost any jail setting. Mr. Zavala advises that this has been particularly difficult because he suffers from hypertension and the food offered is typically high in sodium.

Programs and educational opportunities are also limited in these facilities. Mr. Zavala has sought to take advantage of whatever he can.

29

So too has receiving appropriate medical care for his hypertension and the other heath-related issues detailed earlier. Recently, his ankles and feet began to swell and he believed that these symptoms were related to his hypertension. He advises he has submitted many, many requests, all of which have been ignored for months.

One of the greatest challenges that the BOP faces is delivering adequate and appropriate healthcare, and in a timely fashion. Healthcare is perhaps the single, largest growing cost to the BOP in its annual budget. In a report submitted by the DOJ's Inspector General in 2016, medical costs on inmates were noted to be a significant and increasing part of the annual budget. This is because the prison population is large (and now increasing again), and it is also aging[3].

Counsel's lengthy experience with clients housed at these facilities suggests that getting necessary medical treatment can be very challenging. It sis not uncommon for requests for an examination   to be routinely ignored, until something happens that mandates immediate attention. The culture towards inmate health concerns is reactive rather than proactive, and inmates can often feel that roadblocks are frequently placed in their path to receiving appropriate treatment.

In all likelihood there is great pressure on mangers to contain costs.

---

[3] See, Report of DOJ Inspector General, "The Federal Bureau of Prisons' Reimbursement Rates for Outside Medical Care", https://www.oig.justice.gov/reports/2016/e1604.pdf

Certainly, the BOP is not helped by staffing shortages in this critical area. This necessarily limits inmate access to necessary healthcare[4].

Both MCC, NY and MDC, Brooklyn have problems with insect and vermin infestations. Conditions are not sanitary. Mr. Zavala also reports that there is mold everywhere in and around the unit, his cell and the showers.

Since his arrest in July 2016, Mr. Zavala has been housed primarily at MCC, NY. However, on first arriving, he was placed on the Special Housing Unit (SHU) at MDC, Brooklyn. The first two weeks were spent in what sounds like a "suicide cell" if only because the cot was concrete.

Approximately one month later, Counsel was assured Mr. Zavala would be moved into General Population. That failed to happen.

Even after he was transferred to the MCC, NY, Mr. Zavala was still kept for almost two months in the SHU. Counsel was advised that the delay in moving Mr. Zavala was due to issues with bed-space.

Certainly, Mr. Zavala had "separations" put in place by the government so that he did not come into contact with potential witnesses against him. However, taking almost two full months to resolve the issue had a deleterious impact on his mental and emotional state.

Further exacerbating matters, Mr. Zavala was denied communication with his wife and family during this extremely stressful initial period due to his SHU confinement.

---

[4] *See*, Report of DOJ Inspector General "Review of the Federal Bureau of Prisons' Medical Staffing Challenges", oig.justice.gov/reports/2016/e1602.pdf

31

We ask the Court to take all these matters into consideration under 18 USC 3553(a) when fashioning the appropriate sentence.

## MR. ZAVALA'S ADJUSTMENT TO CONFINEMENT

As noted earlier, Mr. Zavala has had an extremely difficult adjustment to prison life. In addition to the reasons detailed above, Mr. Zavala was previously very active outdoors helping his wife on their farm when he was not performing his duties as a police officer.

Thus, not having access to the outdoors has been a substantial change and a hardship in Mr. Zavala's life.

Further, in this regard, the first couple of months spent in SHU were extremely difficult.

Also for reasons explained above, Mr. Zavala has largely kept to himself in order to minimize the possibilities of confrontation.

Nonetheless, he has tried to take advantage of the few programs available to him, including religious studies, which he has found helpful. Attached as Exhibit I, are copies of certificates and the like attesting to his attendance.

Despite all the difficulties, Mr. Zavala has no disciplinary history, according to the MCC Legal Department. In that regard, he has been a model prisoner.

We ask the Court to also take these matters into consideration under 18 USC 3553(a) when fashioning the appropriate sentence.

## COLLATERAL CONSEQUENCES

### REMOVAL

Once the conviction here is final, Mr. Zavala will, of course, be removed from the United States. His visa was already revoked in July 2016, along with those of his immediate family.

The United States was the country he chose in 2007 when he was seeking sanctuary from those seeking to kill him. He has a brother and extended family living in different parts of the country here. Given the nature of the charges, it is highly unlikely that he will ever be permitted to return to the United States.

Further, Mr. Zavala has been vilified in the Honduran press. Rightly or wrongly, he has been judged in the court of public opinion in his native Honduras. It is very likely that Mr. Zavala will receive a very chilly welcome on his arrival from most of Honduran society. This prospect is particularly galling for a man who prided himself on love of country, public service, duty and honor.

However, in one section of Honduran society his reception could well be uncomfortably hot. Counsel understands media reports in Honduras have suggested that Mr. Zavala has been seeking to cooperate with the government here in an effort to reduce his sentence. While this not true, such reports can only fuel speculation regarding Mr. Zavala on the part of not just the public at large, but also on the part of criminal elements and corrupt politicians.

Mr. Zavala's removal from the United States will present these individuals with the temptation to target him for assassination out of an abundance of

caution, yet again. They might simply prefer to eliminate any risk Mr. Zavala's possible "continued cooperation", as they understand it.  Given Mr. Zavala's personal history and previous experience, his fears are entirely reasonable.

The Court should know that counsel has also seen at least one press report from July 12, 2016 from the Honduran newspaper *Diario La Prensa* that bears directly on this point. The article appeared to contain a photograph of the actual aircraft utilized by DEA to transport Mr. Zavala from Honduras to New York, clearly depicting the aircraft's serial number.

Highly placed officials in the HNP and the Honduran Army have access to the identifying information of individuals being deported from the United States. Accordingly, Mr. Zavala's arrival will be closely monitored in Honduras once he is removed from the United States.

Further, in the current climate, any likelihood of a successful asylum petition being filed by Mr. Zavala before an immigration court seems highly speculative at best.

**PUNISHMENT ON FAMILY**

Already set forth above in this submission is a veritable laundry list of punishments meted out to Mr. Zavala's family for his misdeeds. This seems to go far beyond the norm and certainly exceeds what might normally be expected in circumstances such as confronted by the families of most imprisoned defendants. Typically, they miss their loved one, who is frequently a provider to the family in a variety of different ways.

35

In many ways, and in the typical case, the family is often punished because of the defendant's acts that have led to arrest. And it is not unusual for a defendant to express remorse and regret for what has befallen his family as a consequence of his acts.

Here, however, what has befallen Mr. Zavala's family includes the following:

- The cancellation of their visas by the State Department so that they have been unable to travel to the United States to visit with Mr. Zavala while he has been incarcerated for almost 2 years;

- The seizure of Mr. Zavala's wife's business and all the family's possessions by the Honduran government;

- The seizure of the family home by Honduran authorities, even though Mr. Zavala's wife had been gifted the house by her father years before she met her husband;

- Mr. Zavala's wife has been forced to borrow from wherever she can to help make ends meet and pay bills, in addition to relying on her parents for support for the children;

- The humiliation and bullying of the children at school due to the local press and media reports;

- The suspension of Mr. Zavala's younger brother from the HNP for no misconduct on his part, but merely for being related to Mr. Zavala.

We are not asking the Court to take these things into consideration under 18 USC 3553(a) simply because this family has been made to pay for Mr. Zavala's

36

crimes. Rather, we ask the Court to do so because Mr. Zavala is painfully aware that all these things have befallen his family because of his actions. He knows that none of this would have taken place had he not acted as he did.

For this, he is deeply and profoundly remorseful. This is not a price he would have ever wanted them to pay. Further, as noted earlier, Mr. Zavala is painfully mindful that he is unable to do anything to help them in their time of greatest need. He feels utterly impotent, incapable of offering any kind of support to them for the consequences of his actions.

This overwhelming sense of impotence in these circumstances must be, without exaggeration, its own kind of hell for Mr. Zavala. He was a man who prided himself on being a bulwark for his family. Yet, instead of providing them with nothing but love and the security they so desperately need, he feels he has only succeeded in placing them all in jeopardy. Mr. Zavala knows that his choices and his decisions have completely destabilized their lives.

It would also be no exaggeration to suggest that Mr. Zavala is wracked with guilt.

## PSR REVIEW, OBJECTIONS & COMMENTS

### PSR RECCOMMENDATION

We have reviewed the PSR and Sentencing Recommendation dated March 5, 2018. Probation recommends a sentence of 210 months, the bottom of the otherwise applicable Guideline Range. However, Probation did not have the advantage of the Price Report before it when making its recommendation.

Consequently, the Recommendation erroneously relies on the mistaken assumption that Mr. "Zavala was enticed by the opportunity of financial gain. However, we can conclude that the defendant used his law enforcement position to aid and abet an international drug-trafficking conspiracy." *Id*.

The Recommendation also states earlier in pertinent part, "The defendant used his reputation as a highly decorated, veteran officer with the Honduran National Police to facilitate the activities of a drug-trafficking organization operated by a significant Honduran trafficker." *Id*.

Based upon all the information we now have as a result of the examination and evaluation by Dr. Price, as well as his Report, we know that none of these things is correct.

To be clear, no blame is attached to Probation for making the assumptions, or for coming to the conclusions, that it does. Dr. Price only examined Mr. Zavala on May 1, 2018, almost two months after the PSR was finalized in early March. The Price Report itself was completed two weeks later. Consequently, Probation could not and did not consider Dr. Price's opinion or the arguments that flow in Mr. Zavala's favor as a result.

38

Nonetheless, Mr. Zavala's circumstances are markedly different from that which Probation believes them to be.

As explained earlier, for reasons that were partly cultural and partly the result of his PTSD and other diagnosed conditions, Mr. Zavala misguidedly and illegally acted in a way that he thought was acceptable because, ultimately, his behavior would benefit Honduran society. That he disregarded the law, there is no question. But this Court must recognize that there is an enormous difference between the typical "corrupt cop", who seeks simply to take advantage of his rank and reputation for financial gain, on the one hand, and the individual the Court is presented with here.

Mr. Zavala acted illegally, but did not do so for financial gain. He did so because his mental health issues skewed his judgment so that it did not matter if what he was doing was right or wrong. And, these things he did because of the context of the acculturated attitude that was prevalent at the HNP – "the ends justify the means."

The other aspect of the Recommendation that needs answering is the proffered justification for the length of the prison sentence suggested: "This sentence will give the defendant the opportunity to reflect upon his unlawful conduct." We respectfully disagree.

As should be clear, Mr. Zavala has done little else but reflect on his conduct, and its consequences.

Further, he has come to realize that his conduct actually has helped to contribute to the corrosive effect that crime and corruption has had on Honduran

society. He now values the following the rule of law in order to achieve law enforcement goals. Mr. Zavala recognizes the hypocrisy in placing himself above the law in order to enforce the law, no matter how laudable the objectives. He realizes that to do so is really not serving justice, a concept to which he remains committed. That path, Mr. Zavala now understands, leads to lawless dictatorships.

The Court should know that Mr. Zavala deeply regrets his conduct and now understands that his choices and actions have impacted adversely on respect for the rule of law in his home country. He also understands that these choices and actions have contributed to the negative on the public's perception of the honesty and integrity of his country's police force. This hurts Mr. Zavala deeply, as he had thought of himself as continuing the legacy left for him by his late father, who was himself committed to justice.

Counsel has represented Mr. Zavala for the better part of two years. The Court should know that he has witnessed first-hand the difficulties Mr. Zavala has encountered being in prison and apart from his family.

In counsel's experience, some people can cope more easily with prison life than others. This may be due to background, education and life-experience. In contrast to many if not most other clients, Mr. Zavala impresses in this regard as someone who finds this experience to be very hard indeed. Mr. Zavala has spent much of his police career on units that are paramilitary in nature, such as SWAT and assault-type units, for example. He has also experienced any number of traumatic events.

Counsel has witnessed Mr. Zavala suffer emotional breakdowns during meetings.

Dr. Price also notes that Mr. Zavala "… frequently became tearful during the interview" as he was reporting his mood of helplessness and despair." Price Report, p.6.

Certain aspects of Mr. Zavala's difficulties in coping with prison life are discussed in the Price Report, which addresses how Mr. Zavala has had to deal with the stress that comes from now being housed with those very same criminals he used to hunt down. Mr. Zavala isolates himself as a means of self-preservation, as feels under constant threat of violence. *See* Price Report, p. 9.

Perhaps this is also due in part to the shock of where Mr. Zavala now finds himself, and he realizes that this is, indeed, a sad fall from grace.

Certainly part of his difficulty stems from the guilt and remorse he feels over the consequences of his choices and actions, particularly as they have impacted those closest to him. *Id.*

Mr. Zavala's emotional condition also seems to have deteriorated over time. This observation has been echoed to counsel by a cousin who lives in Westchester County and who visits with him from time to time. Additional letters of support from her and others who know Mr. Zavala are attached as Exhibit J.

The Court should take into consideration the evaluation by Dr. Price. He notes that Mr. Zavala's symptoms of PTSD remain present. He goes on the warn that, "… continued and/or prolonged incarceration would likely lead to further erosion of his mental condition." *Id.*, p.10.

41

When considering specific deterrence, it should be clear that Mr. Zavala lacks the desire or propensity to commit crime generally. Rather, what he did came to be because of a number of specific factors. The chances of him re-offending are minimal at best, given that he will never be reinstated to the HNP. Mr. Zavala's crimes were specific to his role while employed there. Given that he will never again be a police officer, he can never again abuse his position or rank.

Also for the Court's consideration are the other aspects of Mr. Zavala's character and personality, together with his mental health issues and feelings about the consequences of his choices and actions on himself, his family and his country as explained in great detail above. Simply stated, Mr. Zavala does not require further deterrence.

With respect to general deterrence, there really does not appear to be any likelihood that requiring Mr. Zavala to spend additional time in a United States jail will have any impact on the very high levels of crime or corruption in Honduras. Any suggestion to the contrary is speculative and unsupported by any evidence.

**PSR OBJECTIONS & COMMENTS**

PSR ¶10: When advising Probation that he had begun investigating Fernandez-Rosa, he misstated the year. It was early 2013, not 2012. Exhibit H corroborates Mr. Zavala's participation in the investigation of Fernandez Rosa, as he said he had. Additional, extensive documentation further attests to this and can be made available if necessary. Consequently, when Fernandez Rosa's associate, Ruben Mejia, called Mr. Zavala at his office looking for information on

the investigation, Mr. Zavala did indeed falsely tell him he had no information by misinforming Mejia that the investigation was being conducted out Tegucigalpa rather than San Pedro Sula, where Mr. Zavala was based. He did so protect the ongoing HNP investigation and to throw Fernandez Rosa off the trail. The objection to ¶10 and the adverse inferences to be drawn from the suggestion that Mr. Zavala is lying to the Court on this topic.

PSR ¶13: As we understand Probation, the PSR omits Mr. Zavala's claim that he acted with color of authority with respect to the Lobo Conspiracy because the government does not agree. Even putting this position to one side, we do not understand how this leads to the refusal to consider and include this colorable claim based upon the Cerrato Cruz Affidavit annexed as Exhibit E.

PSR ¶14(a): contrary to the government's stated position, the mere fact that Mr. Zavala has pleaded guilty to assisting Fernandez Rosa does not negate the fact that he also investigated him beginning in January 2013. The documents annexed as Exhibit F prove this irrefutably.  Accordingly, we continue to press our objection.

PSR ¶14(b)-(e): the objection to these paragraphs is that they are essentially a distillation the DEA agents' reaction to Mr. Zavala's statements to them a few days prior to his voluntary self-surrender. These are not Mr. Zavala's words verbatim. The agents refused to believe him because what he was attempting to tell them as best he could regarding events from two years prior did not match up with their knowledge of the facts. Consequently, the Court should

43

not credit this version of the events, nor the adverse inference to be drawn that

Mr. Zavala was lying.

## CONCLUSION

Mr. Zavala has been incarcerated for the better part of two years.  He is a first-time offender. He was a highly decorated police officer, wounded twice in the line of duty, Mr. Zavala participated in numerous, high-profile investigations and cases. He had been targeted for assassination. The threats were so serious that he had to seek sanctuary in the United States for almost a year. He was a very active officer who believed in trying to rid his country of corruption with every weapon at his disposal.

His mental health issues, however, in the context of the prevailing HNP culture, facilitated him in make decisions that would lead him to engage in activity that was criminal.

The consequences for Mr. Zavala have been disastrous. His actions have had a direct and highly deleterious impact on his family. He acknowledges that he was misguided, and is profoundly remorseful for the effects his behavior has had on both them and his fellow countrymen.

Mr. Zavala is deeply regretful and depressed by his overwhelming sense of impotence and inability to do anything to make amends or even help in any way.

He has experienced enormous difficulty in adjusting to life while confined. Further confinement risks having the effect on his mental health deteriorating further.

In some ways, Mr. Zavala is extremely fortunate. He still has a family who, despite everything, remain unwavering in their love and support. Nonetheless,

clearly significant work must be undertaken whenever they reunite. Individual therapy, couples therapy and family therapy involving the children would all seem to be appropriate.

For now, Mr. Zavala faces an uncertain future. Even if the Court agrees to release him, he remains fearful of what awaits him in Honduras.

Nonetheless, we urge the Court to sentence Mr. Zavala to time served. On the strength of the record and arguments presented here, such a sentence would allow the Court to temper justice with mercy and would be fully consistent with the Court's mandate to punish Mr. Zavala with a sentence that is sufficient but not greater than necessary.

Respectfully submitted,

HOWARD LEADER
Attorney for Carlos Jose Zavala Velasquez

Dated: May 15, 2018
New York, New York

46