

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 8, 2021

**BY ECF**
The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    <u>United States v. Fabio Porfirio Lobo</u>,
             15 Cr. 174 (LGS)

Dear Judge Schofield:

      The Government respectfully submits this opposition to the *pro se* motion of defendant Fabio Porfirio Lobo ("Lobo" or the "defendant") for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Dkt No. 491 ("Def. Mot."). The defendant is the son of Porfirio "Pepe" Lobo Sosa, who was the president of Honduras between 2010 and 2014. Despite the privilege and opportunity his station in Honduras afforded him, the defendant chose to partner with some of the largest and most violent drug traffickers in the world to help them transport more than a ton of cocaine through Honduras for distribution in the United States. In sentencing the defendant to a 288-month term of imprisonment in 2017, the Court emphasized this grievous breach of trust, noting that the defendant "facilitated strong government support for a large drug trafficking organization" and had used his "connections" and "reputation" to "try to further corrupt connections between drug traffickers and Honduran government officials." Affirming the defendant's conviction and sentence, the Second Circuit echoed this sentiment, holding that the "breadth of Lobo's corruption and the extent of his criminal activity," in particular the fact that he had abused his status as the son of the former President of Honduras to "forge corrupt connections between drug traffickers and the upper echelons of the Honduran Government," justified the sentence imposed.

      Now, after serving only approximately 25 percent of this sentence, the defendant seeks leniency from the Court owing to his medical conditions and the COVID-19 pandemic. The Court should deny the defendant's Motion for two independent reasons. *First*, the defendant has not met his burden of demonstrating extraordinary and compelling reasons to justify any reduction in his sentence. While the defendant has certain medical conditions that the Bureau of Prisons treats while he is in custody, he has failed to disclose to the Court that the Bureau of Prisons offered him the COVID-19 vaccine in January and he refused to take the vaccine. This brazen position—that the defendant should be granted leniency based on the spread of a disease that the Bureau of Prisons attempted to immunize him against—undercuts any argument otherwise available to the defendant concerning his medical conditions and COVID-19. *Second*, even if he could demonstrate extraordinary and compelling reasons, Section 3553(a) weighs strongly against a

reduction in the defendant's sentence. The defendant's heinous criminal conduct more than justifies the sentence the Court imposed, which was already below the bottom of the applicable Guidelines range. The defendant does not merit any further leniency, and the Court should deny his Motion.

I. Background

A. Offense Conduct

Prior to the defendant's arrest in this case, he was a member of a major Honduran drug-trafficking organization known as the "*Cachiros*." The *Cachiros* was a prolific and violent criminal syndicate responsible for receiving large loads of cocaine sent to Honduras from South America via air and maritime routes, and transporting the cocaine within Honduras on behalf of Mexican drug traffickers so that the drugs could be imported into the United States. (Mar. 6 Tr. 12:1-13:15).[1]

Between approximately 2009 and approximately December 2013, Devis Leonel Rivera Maradiaga ("Devis") and Javier Eriberto Rivera Maradiaga ("Javier") were the leaders of the *Cachiros*. (*See* Mar. 6 Tr. 13:5-10). In 2010, the same year his father became president of Honduras after his election in November 2009, the defendant joined the *Cachiros* and agreed to manage security and part of the logistics operations of the organization during a meeting that included the defendant, Devis, President Lobo Sosa, a now-deceased Honduran politician named Juan Gomez, and a Honduran congressman named Oscar Najera. (Mar. 16 Tr. 57:12-58:6; *see also* Mar. 6 Tr. 27:25-30:10).[2] The defendant subsequently participated in the receipt of two cocaine loads that were shipped to Honduras as a transshipment point for importation into the United States, with an aggregate quantity of approximately 1.4 tons—enough cocaine to supply millions of individual doses on the streets of New York.

After Devis and Javier began to cooperate with U.S. law enforcement in late 2013, the defendant agreed to participate in an additional multi-ton shipment of cocaine, which he understood was also destined for the United States, but was in reality a sting investigation conducted by the Drug Enforcement Administration ("DEA"). The defendant's efforts to participate in this shipment led to the charge in this case, as well as his eventual arrest in Haiti and

---

[1] Citations to "Mar. 6 Tr." and "Mar. 16 Tr." are to the transcripts of the *Fatico* hearing conducted by the Court on March 6 and March 16, 2017. Citations to the "PSR" are to the September 6, 2016 Presentence Investigation Report prepared by the Probation Office. Citations to "Dkt." are to entries on the public ECF docket sheet for Petitioner's underlying prosecution, 15 Cr. 174 (LGS).

[2] In December 2019, the State Department designated Oscar Najera for having "engaged in and benefitted from public corruption related to the Honduran drug trafficking organization *Los Cachiros*." *See* https://2017-2021.state.gov/public-designation-due-to-involvement-in-significant-corruption-of-honduran-congressman-oscar-ramon-najera//index.html.

expulsion to the United States.[3] More specifically, in December 2013, Devis, at the direction of U.S. law enforcement, approached the defendant and asked him to provide security and logistical support for a 2,500-kilogram shipment of cocaine allegedly destined for Joaquin Archivaldo Guzman Loera, a/k/a "El Chapo"—the former leader of the Sinaloa Cartel. (PSR ¶ 17). The defendant agreed to provide security and support, in the form of two vehicles and four men, and agreed to accept 200 kilograms of cocaine from the 2.5-ton load as payment. (*Id.*). Months later, the defendant met again with Devis and with a confidential source ("CS-1") acting at the DEA's direction, and confirmed his participation in the shipment and expectation that he would receive 200 kilograms of cocaine in exchange for his efforts. (PSR ¶ 18). Then, in May 2014, the defendant met with two other confidential sources acting at the DEA's direction and, among other things, (a) confirmed he had worked with the *Cachiros* before and would provide "military" support from current Honduran generals and "logistics" support for the cocaine load, and (b) boasted of prior narcotics trafficking and his connections through his father. (*See* PSR ¶ 19).

Lobo continued to meet with DEA confidential sources and Devis to plan their cocaine transaction over the ensuing months. Among other things, Lobo introduced six members of the Honduran National Police—his eventual co-defendants—to the other members of the purported conspiracy. (PSR ¶ 21). In Lobo's presence, these corrupt police officers discussed how they would help transit the cocaine through Honduras and discussed the safest routes to avoid interdiction. (*Id.*). Eventually, communicating from U.S. prison, Devis told the defendant that he would provide the defendant with his promised cocaine payment in Haiti, and Haitian officials detained the defendant after he traveled to Haiti to collect. (*Id.* ¶¶ 28-29). The DEA took custody of the defendant on May 21, 2015. (*Id.* ¶ 29).

### B. Indictment and Guilty Plea

Indictment 15 Cr. 174 (LGS) (the "Indictment") was filed on March 18, 2015, charging the defendant with participating in a conspiracy to import five or more kilograms of cocaine into the United States, in violation of Title 21, United States Code, Section 963. (Dkt. 3). On May 16, 2016, the defendant pleaded guilty without the benefit of a plea agreement to the charge in the Indictment. (*See* Dkt. 31).

### C. *Fatico* Hearing and Sentencing

Following the defendant's guilty plea, the parties advised the Court of factual disputes relevant to sentencing, including the extent of the defendant's involvement in the offense and the applicability of several Guidelines enhancements. The District Court conducted a *Fatico* hearing on March 6 and 16, 2017 to resolve the disputes.

After the conclusion of the hearing and post-hearing briefing, the Court issued findings of fact and conclusions of law on June 30, 2017. *See United States v. Lobo*, No. 15 Cr. 174 (LGS),

---

[3] Further detail of the offense conduct can be found in the Government's sentencing memorandum and opposition to the defendant's pending Section 2255 motion. (*See* Dkts. 126, 415).

2017 WL 2838187 (S.D.N.Y. June 30, 2017). The Court found Devis to have been "credible in light of the entirety of the record and observations of his tone, demeanor and straightforward answers," and that "[d]efense counsel's cross-examination failed to undermine [Devis's] credibility as to key portions of his testimony, especially regarding [Lobo's] involvement in the two multi-hundred-kilogram cocaine shipments in 2012 and 2013." *Id.* at *2. The Court also concluded, among other things, that, " [i]n his post-hearing submission, [Lobo] 'does not object' to the Government's proposed findings of fact (based on [Devis's] testimony) regarding [the defendant's] involvement in a 400-kilogram shipment in 2012 and a 1,000-kilogram shipment in 2013." *Id*.

The Court sentenced the defendant on September 5, 2017. (*See* Ex. A ("Sent. Tr.")). With respect to the Guidelines, the Court calculated a total offense level of 42 based on (i) a base offense level of 38, pursuant to U.S.S.G. § 2D1.1(a)(5), because the offense involved more than 450 kilograms of cocaine; (ii) a combined seven-level enhancement pursuant to U.S.S.G. §§ 2D1.1(b)(1), 2D1.1(b)(15)(C), and 3B1.1(b); and (iii) a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The seven-level enhancement included a two-level enhancement pursuant to Section 2D1.1(b)(1) for the possession and use of dangerous weapons, owning to the defendant's admission that he had previously helped transport loads of cocaine and that firearms were used to ensure safe passage. (*See* PSR ¶ 35; Ex. A at 5). In addition, the Court found that a three-level enhancement pursuant to Section 3B1.1(b) was appropriate due to the defendant's role as a manager or supervisor of the conspiracy, which involved five or more participants. (*See* PSR ¶ 38; Ex. A at 5). As the defendant was in Criminal History Category I, the Court found that the applicable Guidelines range was 360 months to life imprisonment.

After hearing from the Government, the defendant, and defense counsel, the Court imposed a sentence consisting principally of 288 months' imprisonment, a $50,000 fine, and $266,667 in forfeiture. In explaining the reasons for the sentence imposed and the application of the statutory sentencing factors under Section 3553(a), the Court emphasized the need to achieve general deterrence, to promote respect for the law, and to avoid unwarranted sentencing disparities. In particular, the Court found that:

> The most damning fact in your background and in your participation in this is that you are not like the police officers who have made plea agreements with the government for a much less amount of time in prison. You were the son of the sitting president of Honduras, and you used your connections, your reputation in your political network to try to further corrupt connections between drug traffickers and Honduran government officials. And these included not only lowly officials, like customs people and military and law enforcement personnel, but also extremely high level officials. In short, what distinguishes your case from so many is that you facilitated strong government support for a large drug trafficking organization for multiple elements of the Honduran government, and you enriched yourself in the process.

(Sent. Tr. 20). The Court continued: "The point is really that you abused who you are and the benefits and advantages that you had to further this crime. . . . whether it was four tons, whether it

was half a ton, the fact that is most weighty in my mind was the abuse of your position and the privilege that you enjoyed." (Sent. Tr. 20-21).

### D. Direct Appeal and Post-Conviction Litigation

The defendant challenged his sentence on direct appeal, raising arguments relating to procedural and substantive reasonableness. The Court of Appeals affirmed his sentence on September 20, 2018. *United States v. Romero*, 904 F.3d 238 (2d Cir. 2018); *United States v. Romero*, 749 F. App'x 31 (2d Cir. 2018). In affirming the sentence, the Second Circuit found, among other things, that the defendant was the "son of a President" who had "used his connections to forge corrupt connections between drug traffickers and the upper echelons of the Honduran government." *Romero*, 749 F. App'x at 34. As to general deterrence, the Court of Appeals found that, given the "breadth of Lobo's corruption and the extent of his criminal activity, the district court acted well within its discretion when it imposed a sentence reflecting the need to deter government officials from using their positions of power to facilitate drug trafficking." *Id.* at 34-35. The defendant filed a petition seeking a writ of certiorari, which the Supreme Court denied on January 14, 2019. *Lobo v. United States*, 139 S. Ct. 933 (2019). Finally, the defendant filed a motion pursuant to 28 U.S.C. § 2255 dated June 19, 2019 which was filed on ECF on October 24, 2019. (Dkt. No. 393). The Government opposed the motion on December 31, 2019. (Dkt. No. 415).

### E. Lobo's Compassionate Release Motion

Lobo's Motion for compassionate release is dated January 19, 2021 and was docketed on January 26, 2021. (Dkt. 491). Lobo argues that three medical conditions make him particularly susceptible to COVID-19 and qualify as extraordinary and compelling circumstances. (Mot. at 2-6). More specifically, Lobo asserts that he has "hypertension, respiratory infections, and kidney problems[.]" (*Id.* at 4). Lobo claims that his medical records "provide sufficient evidence of respiratory or kidney problems" and hypertension, placing him at "high risk for severe illness from COVID-19." (*Id.*). In addition, the defendant points to the situation at his facility, FCI Coleman Low, in support of his Motion. (*Id.* at 5). Lobo argues that as of the date of his Motion, there were 15 inmates and 13 staff members with COVID-19, and that 168 inmates and 63 staff had recovered by that date. (*Id.*). Thus, Lobo contends, his continued incarceration, coupled with his medical conditions, qualifies as "extraordinary and compelling." (*Id.*). Finally, the defendant obliquely claims that his "rehabilitative efforts" at FCI Coleman Low support his Motion. (*Id.* at 5-6). Lobo argues that these efforts demonstrate that he "is remorseful and rehabilitated" and should be released and deported "back to Honduras" to live with his sister. (*Id.* at 6).

Lobo attaches three exhibits to his Motion. First, he attaches the BOP's rejection of his Motion for compassionate release as Exhibit A. Second, he attaches some of his BOP medical records as Exhibit B.[4] Third, he attaches BOP records concerning programs he has completed while incarcerated and containing his sentence computation as Exhibit C.

---

[4] As instructed by the Court in its January 29, 2021 Order, the Government has filed by email a full set of the defendant's medical records, and has served a copy on the defendant. (Dkt. 492).

### F. Lobo's Scheduled Release Date and Time Served

The BOP is scheduled to release the defendant on November 1, 2035, with credit for good time served. (Ex. C at 3). Absent that credit, his projected release date is May 20, 2039. (*Id.*). To date, the defendant has served approximately 5 years and 8 months of his sentence. (*Id.*). The BOP computes that this is 23.7 percent of his full sentence, and 27.8 percent of his term with credit for good time served. (*Id.*).

### II.     Applicable Law

#### A. Section 3582

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, the Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute. As relevant here:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id*. A Court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. Sept. 25, 2020). Although courts are not constrained by the relevant Sentencing Commission policy statement, it remains instructive. That statement provides that the BOP may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

While the Court is free to consider other circumstances as well, the Application Note describes some of the circumstances under which "extraordinary and compelling reasons" may

---

Because of the sensitive nature of the information set forth in the medical records, the Government respectfully requests that the records be maintained under seal.

exist:

> (A) Medical Condition of the Defendant.—
>
>> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—
>>
>>> (I) suffering from a serious physical or medical condition,
>>>
>>> (II) suffering from a serious functional or cognitive impairment, or
>>>
>>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* at app. note 1(A). As the movant, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist under the above criteria to justify early release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

Whether such "extraordinary and compelling reasons" exist, however, is only "[t]he threshold question." *United States v. Daugerdas*, 2020 WL 2097653, at *2 (S.D.N.Y. May 1, 2020) (Pauley, J.). "[T]his Court's analysis does not end with a finding that 'compelling and extraordinary reasons' warrant compassionate release. This Court must also 'consider[] the factors set forth in section 3553(a).'" *Id.* at *4; *see also* 18 U.S.C. § 3582; U.S.S.G. § 1B1.13. Those § 3553(a) factors include, among others:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct; [and]
>> (C) to protect the public from further crimes of the defendant . . . .

18 U.S.C. § 3553(a).

## III. Discussion

### A. Lobo's Medical Conditions Do Not Warrant Release

Lobo has not cleared the threshold question under Section 3582 by establishing "extraordinary and compelling" reasons to justify his release. In seeking his immediate release, the defendant argues that his underlying health conditions place him at high risk for complications from COVID-19 if he contracts the virus, and that the conditions of confinement make it difficult for the BOP to take adequate preventative measures to avoid that outcome.

In his Motion, the defendant fails to disclose to the Court that the BOP offered him the Moderna COVID-19 vaccine on January 4, 2021—11 days before he submitted the Motion—and he refused to be vaccinated. (*See* Ex. B at 33). The defendant should not now be heard to complain about his risk of catching COVID-19 when the BOP tried to provide him with a scarce resource that could have protected him from the disease. *See, e.g.*, *United States v. Henareh*, No. 11 Cr. 93 (JSR), 2021 WL 119016, at *4 (S.D.N.Y. Jan. 13, 2021) (finding that risk of COVID-19 infection was not extraordinary and compelling circumstance justifying release based, in part, on fact that vaccine "may be available" at BOP facility in question in near future); *United States v. Olivo*, No. 15 Cr. 194 (VEC), 2021 WL 21898, at *2 (S.D.N.Y. Jan. 2, 2021) ("Despite these serious medical considerations, there are some countervailing factors that mitigate against finding that Mr. Olivo has established extraordinary and compelling circumstances warranting early release. First, while the allocation of vaccines is still uncertain, given his medical conditions and incarceration in a federal facility, the Court anticipates that Mr. Olivo will be among the earlier recipients of a COVID-19 vaccine.").[5] Standing alone, this provides a basis for the Court to find that the defendant has not demonstrated extraordinary and compelling reasons and is dispositive.

---

[5] *See also United States v. Lohmeier*, No. 12 Cr. 1005 (JJT), 2021 WL 365773, at *2 (N.D. Ill. Feb. 3, 2021) ("In declining vaccination (twice), [the defendant] declined the opportunity to reduce his risk exposure to COVID-19 dramatically; he cannot reasonably expect that prolonging his risk by declining vaccination will be rewarded with sentence reduction."); *United States v. McBride*, No. 19 Cr. 007 (KDB), 2021 WL 354129, at *3 (W.D.N.C. Feb. 2, 2021) (refusal to get vaccinated "undermines [the defendant's] assertion that extraordinary and compelling reasons exist to warrant his release from prison"); *United States v. Williams*, No. 17 Cr. 1279 (DLR), 2021 WL 321904, at *3 (D. Az. Feb. 1, 2021) (noting refusal to take the vaccine undermined any claim that defendant believed he was at risk of exposure while in prison); *United States v. Gonzalez Zambrano*, No. 18 Cr. 2002 (CJW), 2021 WL 248592, at *5 (N.D. Iowa Jan. 25, 2021) ("It would be paradoxical to endorse a system whereby a defendant could manufacture extraordinary and compelling circumstances for compassionate release by unreasonably refusing the health care [the vaccine] afforded to them."); *United States v. Hargrove*, No. 18 Cr. 22 (VLB), 2021 WL 170836, at *7 (D. Conn. Jan. 19, 2021) ("Vaccination from the virus would undercut the argument that release to home confinement to prevent him from contracting the virus constitutes 'extraordinary and compelling' reasons to modify his sentence.").

Hon. Lorna G. Schofield  Page 9
February 8, 2021

Beyond that, the defendant cites three health issues: hypertension, respiratory infections, and kidney problems. (*See* Def. Mot. at 4-6). Taking each in turn:

- Hypertension. Essential hypertension, also called "primary" or "regular" hypertension—*i.e.*, the type of hypertension reflected by Lobo's BOP medical records—is not a proven COVID-19 risk factor. Only pulmonary hypertension is.[6] Neither the defendant's BOP medical records obtained by the Government, nor the records cited by the defendant in his Motion, indicate that Lobo suffers from pulmonary hypertension or any instances of hypertensive or respiratory distress; rather, the BOP medical records refer to Lobo's hypertension as "Benign essential hypertension." (*See, e.g.*, Ex. B at 72, 86, 101, 229, 251). Further, as repeatedly noted in his BOP medical records, the BOP provides the defendant with amlodipine to treat his hypertension, and has since at least May 2015, when the defendant first arrived in custody in the United States. (*See, e.g.*, *id.* at 6, 26, 72, 109, 449). In short, the medical records demonstrate that BOP medical personnel are monitoring and treating the defendant's high blood pressure, which, in any event, does not qualify as an extraordinary and compelling reason justifying his release.

- Respiratory infections. The defendant also claims that his "respiratory infections" suffice as extraordinary and compelling. To that end, his medical records reveal that the defendant has in the past shown signs of influenza, most recently in March 2020. (*See* Ex. B at 11). The records also reveal that, when he has exhibited such symptoms, the BOP medical staff has treated him, and the BOP has also vaccinated him for influenza annually. (*Id.* at 11, 12, 195, 257, 338, 444 (documenting annual flu vaccine)). In addition, the defendant has, in the past, complained of pain when breathing and suffered inflammation in his lungs when he fell from his bed on to a table in his cell in 2016. (*Id.* at 289-90). Beyond that, the records do not reveal any chronic respiratory issues or infections, and the defendant does not cite to any such proof in the Motion. For

---

[6] *See United States v. Corley*, No. 18 Cr. 454 (KPF), 2021 WL 242451, at *4 (S.D.N.Y. Jan. 25, 2021) (finding that regular hypertension did not suffice to meet this burden because it fell into category that "might" place individual at higher COVID-19 risk, but more study was required); *United States v. Slater*, No. 04 Cr. 48 (JSR), Dkt. No. 1251 at 4-5 (S.D.N.Y. June 30, 2020) ("[G]eneric hypertension is a common condition shared by more than 75 million Americans and can usually be effectively managed through monitoring and medication." (citing https://www.merckmanuals.com/professional/cardiovascular-disorders/hypertension)); *United States v. Sattar*, No. 02 Cr. 395 (JGK), Dkt. No. 1089 at 6 (S.D.N.Y. June 17, 2020) (denying compassionate release to a 60-year-old inmate on the grounds that, among other things, "at this point, the [CDC] guidance suggests that pulmonary hypertension, which [the inmate] does not claim to suffer from, is a genuine risk factor, and the guidance does not suggest that regular hypertension, which [the inmate] does claim to suffer from, is a risk factor").

Hon. Lorna G. Schofield											Page 10
February 8, 2021

> example, there is no mention of "asthma" in the defendant's medical records, let alone severe asthma, and his recent COVID-19 related examinations revealed no issues breathing. (*See id.* at 1, 22). As such, these claims also fall flat.
>
> - Kidney issues. Third, the defendant claims that he has "kidney issues" that justify his release from prison. Again, however, his medical records tell a different story. There is no mention in his records of any kidney issues, despite repeated medical visits over the course of his time in custody, and extensive treatment for a number of ailments, including hypertension, as noted above, hemorrhoids, and arthritis. (*See e.g.* Ex. B at 135). Further, his medical records indicate annual glomerular filtration rate ("GFR") testing, which is used to check kidney function. According to the National Institutes of Health, a GFR above 60 is in the "normal range." *See Nat'l Inst. of Health*, Explaining Your Kidney Test Results, https://www.niddk.nih.gov/health-information/professionals/advanced-search/explain-kidney-test-results. The defendant's GFR has been above 60 since he has been in custody. (*See* Ex. B at 55 (2020 testing), 130 (2019), 218 (2018), 276 (2017), 355 (2016), and 480 (2015)). Thus, again, the defendant's claim is without merit.

In short, there is no reason to believe that BOP personnel cannot continue to monitor and treat these conditions, which do not suffice as extraordinary and compelling in any event, as they have done throughout the defendant's entire time in prison. *See, e.g.*, *United States v. Merlo*, No. 17 Cr. 738 (LAK), 2020 WL 3001039, at *2 (S.D.N.Y. June 4, 2020) ("Moreover, even assuming that defendant's motion correctly catalogued his ailments, he would not have met his burden of proving that they warrant his early release in light of the COVID-19 pandemic. Critically, defendant has adduced no evidence that these conditions cannot be managed in prison or that his health is unstable."). Beyond that, two of the three claims by the defendant are not supported by his medical records and, even if they were, would not qualify as extraordinary and compelling reasons within the meaning of Section 3582.

In addition to the three conditions the defendant relies on in his Motion, there are two other medical conditions that the Government brings to the Court's attention. First, the defendant's medical records reveal that he has hyperlipidemia. (*See* Ex. B at 12). Hyperlipidemia is also not among the CDC's identified risk factors. *See, e.g.*, *United States v. Santiago*, No. 92 Cr. 563, 2020 WL 2475068, at *1 (E.D.N.Y. May 13, 2020) (finding no extraordinary and compelling circumstances in the case of a forty-eight year-old defendant who alleged that his obesity, myocardial disease, hyperlipidemia, cardiovascular disease, and history as a smoker placed him at a heightened risk of severe illness from COVID-19). Similarly, as is the case with the defendant's essential hypertension, BOP medical records reflect that BOP medical staff is ably monitoring and treating the defendant's hyperlipidemia. (*See*, *e.g.*, Ex. B at 135 (noting that, for his "unspecified hyperlipidemia," the defendant is prescribed one 10 mg tablet of Atorvastatin each evening)).

Finally, the defendant's BOP medical records reveal that his body mass index ("BMI") is between 31 and 31.9. (*See* Ex. B at 29). This BMI may place the defendant at an increased risk of severe illness from COVID-19, according to the Centers for Disease Control and Prevention.

Hon. Lorna G. Schofield	Page 11
February 8, 2021

*See* Centers for Disease Control and Prevention, "People With Certain Medical Conditions," *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited February 3, 2021). Normally, the Government would concede that this BMI suffices to establish extraordinary and compelling reasons within the meaning of Section 3582, and Courts within this Circuit have been split on whether a BMI around this level qualifies as extraordinary and compelling (including in cases involving a concession from the Government). *See, e.g.*, *United States v. Suarez*, 16 Cr. 453 (RJS), 2020 WL 7646888, at *4 (citing cases establishing that "numerous courts in this Circuit have continued to hold that obesity – particularly where, as here, the movant's BMI is just barely above 30 – does not constitute 'extraordinary and compelling' circumstances calling for relief."). In this case, however, the defendant refused to take a vaccine that would have protected him against COVID-19 infection, BMI notwithstanding. As such, he cannot now rely on his BMI, or any other medical condition, to seek an early release from incarceration. *See supra* p. 8, n. 5.

In addition, the BOP has taken significant steps to mitigate the risks of COVID-19 to inmates and staff. BOP's success in limiting the spread of COVID-19 at most of its facilities is no doubt the result of the many preventative measures that the agency implemented months ago to mitigate risks to the health and safety of all inmates and staff. As the Court is assuredly aware from briefing in other cases, since the COVID-19 outbreak began, BOP quickly and aggressively implemented an Action Plan, which remains in effect.[7] The BOP's modified operations have gone to great lengths to prevent the spread of COVID-19 among staff and inmates, and to screen inmates and quickly quarantine them if there is possible COVID-19 exposure. In addition to his generalized claims about BOP's inability to control and mitigate the spread of COVID-19, the defendant references the situation in particular at his facility – Coleman Low FCI. (*See* Def. Mot. at 4-5). However, as of February 8, 2021, there are zero inmate COVID-19 cases at Coleman Low FCI, and 23 staff cases. *See* http://www.bop.gov/coronavirus (last visited February 8, 2021). Coleman Low FCI has 1,780 inmates, including 1,625 inmates at the federal correctional institution and 155 inmates at the adjacent prison camp. *See* http://www.bop.gov/locations/institutions/col (last visited February 8, 2021). As such, it is clear that the BOP's protective measures at Coleman Low FCI have worked, as the facility currently has a COVID-19 infection rate lower than the general population, among both inmates and staff, and the inmate population, in particular, has been well protected with zero active cases. *See also United States v. Williams*, No. 10 Cr. 13 (MCR), 2021 WL 289063, at *2 (M.D. Fla. Jan. 28, 2021) ("In addition, the conditions at Coleman Low FCI do not rise to the level of extraordinary and compelling circumstances. … The state of affairs at Coleman Low FCI is not exceptional compared to other prisons."); *United States v. Sprenkle*, No. 13 Cr. 146 (AWI), 2020 WL 7490083, at *4 (E.D. Cali. Dec. 21, 2020) (declining to find extraordinary and compelling reasons for inmate at FCI Coleman Low based, in part, on facility's successful effort to deal with COVID-19); *United States v. Cleveland*, No. 12 Cr. 6109 (FPG), 2020 WL 6886559, at *3 (W.D.N.Y. Nov. 24, 2020) ("Defendant does not indicate that the conditions at FCI Coleman have deteriorated since his last application. Indeed, the data indicate that the condition at FCI Coleman Low has significantly

---

[7] Information about the protections that the BOP has implemented can be found at the BOP's COVID-19 website at http://www.bop.gov/coronavirus.

improved; in September there were 93 inmates and 22 staff with confirmed and active cases of COVID-19 but now there are only 2 inmates and 21 staff with confirmed and active cases.").

### B. The Motion Should Be Denied Based on the Section 3553(a) Factors

The Court should also deny Lobo's Motion for the independent reason that compassionate release is not appropriate under 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A).

In the four years since the Court sentenced the defendant to 288 months' imprisonment, the magnitude of his crime has not diminished, and for many of the same reasons justifying a serious sentence when the Court initially sentenced the defendant, Section 3553(a) supports a denial of the defendant's Motion. Judges in this District have consistently denied compassionate release motions where the Section 3553(a) factors weighed against modifying the defendant's sentence, even in the presence of serious medical issues. *See, e.g.*, *United States v. Credidio*, No. 19 Cr. 111 (PAE), 2020 WL 1644010, at *1 (S.D.N.Y. Apr. 2, 2020) (denying a request to reduce a sentence of 33 months' imprisonment to home confinement for 72-year-old defendant deemed by BOP to be at high risk of COVID-19 complications, because "a lengthy term of imprisonment is required for [the defendant] for all the reasons reviewed at sentencing"); *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *5 (S.D.N.Y. Feb. 24, 2020) (denying motion of defendant suffering from, among other things, asthma and high blood pressure; "The sentencing factors weigh heavily against the reduction of [the defendant's] sentence to time served."), *reconsideration denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020). Apart from pointing to programs he has completed while incarcerated, the defendant offers no new arguments as to how or why the Section 3553(a) factors the Court considered in connection with sentencing counsel in favor of the extraordinary relief he now seeks. While commendable, the defendant should not receive a windfall for his decision to participate in these programs while in prison. Availing himself of these programs is part of the reason why the BOP currently forecasts the defendant's release on good time credit. (*See* Ex. C at 3 (computing defendant's sentence, including credit for good time served)). Thus, the defendant's jail conduct has prospectively earned him a benefit, and if he stays the course, he will receive that benefit in due course from the BOP.

Moreover, an application of Section 3553(a) today still counsels in favor of continued detention. First, the nature and circumstances of the offense were undoubtedly serious, as emphasized by the Court at sentencing. The defendant was an essential cog in the distribution of huge quantities of cocaine to the United States—not just as the distributor of said cocaine, but through his connections to the highest levels of the Honduran government. "The harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, No. 16 Cr. 453 (RJS) (ECF No. 160, Tr. 27). "[T]he drugs at issue here cripple individuals and destroy[] families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (quotations omitted). Absent corrupt politicians like the defendant and his father, the transit of massive quantities of cocaine becomes much more difficult (if not impossible). With them, and with their willingness to corrupt their communities and abuse their authority, criminal syndicates become able to transport and

distribute ton-quantities of poison to this community. In addition, without fail, rampant violence that rips families and communities apart attaches to cocaine distribution of this magnitude. Instead of trying to help his home country or use his privilege to the betterment of his community, the defendant abused it to destructive ends. The offense could hardly be more serious, and this factor still speaks loudly to the need for the sentence imposed.

Second, the history and characteristics of the defendant militate strongly in favor of the need for continued detention. The defendant engaged in years of cocaine trafficking. He did so despite privilege and opportunity that many in his country, sadly, do not have. Not only was the defendant's father (and co-conspirator) the President of Honduras, but the defendant himself was well educated and a lawyer in his country. Further, the defendant's conduct in this case was no aberration. He worked with the *Cachiros* for years until his arrest, helping to import hundreds of kilograms of cocaine across many years. Thus, while this case represented the defendant's first arrest and conviction, it was hardly an isolated incident, and the defendant's own history and characteristics support the sentence imposed by the Court in 2017.

Third, the need for deterrence of the defendant and others similarly situated remains paramount. Unfortunately, the system that the defendant and his father helped proliferate continues to this day—as in part reflected by recent prosecutions in this District, cocaine trafficking and corruption continues to work hand-in-glove in Honduras. *See, e.g.*, *United States v. Mejia Vargas, et al.*, 15 Cr. 174 (LGS) (defendant's co-conspirators, seven members of the Honduran National Police ("HNP"), pled guilty to weapons charges and/or drug-trafficking offenses); *United States v. Fredy Renan Najera Montoya*, 15 Cr. 378 (PGG) (Honduran Congressman pled guilty to drug-trafficking and firearms offenses and acknowledged that he facilitated the importation of at least approximately 20,000 kilograms of cocaine into the United States); *United States v. Juan Antonio Hernandez Alvarado*, 15 Cr. 379 (PKC) (former Honduran Congressman and brother of current President of Honduras ("CC-4") convicted of drug trafficking and weapons offenses after trial, faces a 40-year mandatory minimum sentence). The evidence from these prosecutions places in stark relief the need for general deterrence in this case. For example, a cooperating witness at the *Hernandez Alvarado* trial, Alex Ardon, testified that, in 2009, the defendant's father asked Ardon for $2 million in drug proceeds to support his campaign for the presidency and the campaign of CC-4 for a congressional seat. (*See Hernandez Alvarado* Trial Tr., attached as Exhibit D, at 395-97). Cashing in on his drug-fueled campaign donation, in 2012, Ardon asked the defendant's father for protection from a rival drug trafficker, and the defendant's father, in response, sent over 100 Honduran army soldiers, armed with M16s, M60s, and rocket-propelled grenade launchers, to protect Ardon. (*See id.* at 430-33). Then, in 2017, Ardon met with Hernandez Alvarado and CC-4 in Honduras, and CC-4 asked Ardon to "finance" the campaign of the National Party in certain areas in Honduras. (*See id.* at 460-62). Finally, in its recently filed motions *in limine* in the upcoming trial *United States v. Geovanny Fuentes Ramirez*, S6 15 Cr. 379 (PKC), the Government revealed anticipated witness testimony that CC-4 told Fuentes Ramirez that he was going to "shove the drugs right up the noses of the gringos," a reference to sending cocaine to the United State (the "gringos"). *See Fuentes Ramirez*, Dkt. 224 at 20. As such, a denial of the defendant's Motion for release would send the necessary message to CC-4 and other corrupt politicians at the highest levels of the Honduran government that this

conduct will not be tolerated in the United States, and that cocaine trafficking to this community has consequences.

Similarly, the need to deter the defendant from returning to criminal conduct is paramount. The defendant worked with some of the largest and most violent cocaine traffickers in Honduras for years. Cocaine trafficking in Honduras remains prolific, and there will undoubtedly be opportunities for the defendant to return to his prior trade if he is returned to Honduras. A rejection of the defendant's Motion is necessary to send him the right message—that corruption and cocaine trafficking was and remains unacceptable—so that he does not return to his criminal ways upon his eventual release.

### IV. Conclusion

The Court should deny the defendant's Motion. The defendant has not identified an "extraordinary and compelling" reason that warrants his immediate release because he declined to take the COVID-19 vaccine. Further, even if he had, all of the relevant Section 3553(a) factors continue to strongly support the 288-month sentence imposed by the Court in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By: s/ Jason A. Richman
Jacob Gutwillig
Matthew Laroche
Amanda L. Houle
Jason A. Richman
Elinor Tarlow
Assistant United States Attorneys
(212) 637-2589

## AFFIRMATION OF SERVICE

I, Jason A. Richman, affirm under penalty of perjury as follows:

1. I am an Assistant United States Attorney in the Southern District of New York.

2. On February 8, 2021, I caused a copy of the foregoing to be served on the defendant via U.S. mail at the following address:

Fabio Porfirio Lobo, USMS # 92384-054
FCI Coleman Low
Federal Correctional Institution
P.O. Box 1031
Coleman, Florida 33521

Dated: New York, New York
February 8, 2021

s/ Jason A. Richman
Jason A. Richman
Assistant United States Attorney
(212) 637-2589